# HOPKINS *v.* UNITED STATES.

## CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE EIGHTH CIRCUIT.

No. 210.  Argued February 28, March 1, 1898. —Decided October 24, 1898.

The Kansas City Live Stock Exchange was an unincorporated volunteer association of men, doing business at its stock yards, situated partly in Kansas City, Missouri, and partly across the line separating Kansas City, Missouri, from Kansas City, Kansas.   The business of its members was to receive individually consignments of cattle, hogs, and other live stock from owners of the same, not only in the States of Missouri and Kansas, but also in other States and Territories, and to feed such stock, and to prepare it for the market, to dispose of the same, to receive the proceeds thereof from the purchasers, and to pay the owners their proportion of such proceeds, after deducting charges, expenses and advances.   The members were individually in the habit of soliciting consignments from the owners of such stock, and of making them advances thereon.   The rules of the association forbade members from buying live stock from a commission merchant in Kansas City, not a member of the exchange. They also fixed the commission for selling such live stock, prohibited the employment of agents to solicit consignments except upon a stipulated salary, and forbade the sending of prepaid telegrams or telephone messages, with information as to the condition of the markets.   It was also provided that no member should transact business with any person vio-

lating the rules and regulations, or with an expelled or suspended member after notice of such violation. *Held,* that the situation of the yards, partly in Kansas and partly in Missouri, was a fact without any weight; that such business or occupation of the several members of the association was not interstate commerce, within the meaning of the act of July 2, 1890, c. 647, " to protect trade and commerce against unlawful restraints and monopolies; " and that that act does not cover, and was not intended to cover, such kind of agreements.

THIS suit was commenced by the United States attorney for the District of Kansas, acting under the direction and by the authority of the Attorney General of the United States, against Henry Hopkins and the other defendants, residents of the State of Kansas and members of a voluntary unincorporated association, known and designated as the Kansas City Live Stock Exchange. The purpose of the action is to obtain the dissolution of the exchange, and to perpetually enjoin the members from entering into or from continuing in any combination of a like character.

As a foundation for the relief sought it was alleged in the bill that the members of this association, known as the Kansas City Live Stock Exchange, have adopted articles of association, rules and by-laws which they have agreed to be bound by ; that the business of the exchange is carried on and conducted by a board of directors at the Kansas City stock yards, which are situated partly in Kansas City in the State of Missouri and partly in Kansas City in the State of Kansas, the building owned by the stock yards company being located one half of it in the State of Missouri and the other half in the State of Kansas, and half of the defendants have offices and transact business in these stock yards and in that part of the building which is within the State of Kansas, and the other half in that part of the building which is in the State of Missouri; that the Kansas City Stock Yards Company is a corporation owning the stock yards, where the business is done by the members of the exchange; that substantially all the business transacted in the matter of receiving, buying, selling and handling their live stock at Kansas City is carried on by the defendants herein and by the other members of the exchange as commission merchants, and that large numbers of the live stock, consisting

of cattle and hogs and sheep bought and sold and handled at the stock yards by the defendants and their fellow members in the exchange, are shipped from the States of Nebraska, Colorado, Texas, Missouri, Iowa, and Kansas, and the Territories of Oklahoma, Arizona and New Mexico; that when this stock is received at the stock yards it is sold by the defendants, members of the exchange, to the various packing houses situated at Kansas City, Missouri, and Kansas City, Kansas, and it is also sold for shipment to the various other markets, particularly Chicago, St. Louis and New York; that vast numbers of cattle, hogs and other live stock are received annually at the stock yards and handled by the members of the exchange.

The bill also alleges that large numbers of the live stock sold at the stock yards by the defendants are incumbered by mortgages thereon, executed by their owners in the various States and Territories, which mortgages have been given to various defendants as security for money advanced by them to the different owners to enable them to feed and prepare the cattle for market, and that when the live stock so mortgaged are ready for shipment, they are sent to the defendants who have advanced the money and received the mortgages, and on the sale of the stock the amount of these advances and interest is deducted from the proceeds of the sale of the cattle by the commission merchants owning the mortgages; that ninety per cent of the members of the exchange make such advances, and that the market is largely sustained by means of the money thus advanced to the cattle raisers by the defendants, and that Kansas City is the only place for many miles about, which constitutes an available market for the purchase and sale of live stock from the large territory located in the States and Territories already named; that it is the custom of the owners of the cattle, many of them living in different states, and who consign their stock to the Kansas City stock yards for sale to draw drafts on the commission merchants to whom the live stock is consigned, which the consignors attach to the bill of lading issued by the carrier, and the money on these drafts is advanced by the local banks throughout the western States

and Territories. These drafts are paid by the consignees and the proceeds remitted to the various owners through the banks.

The business thus conducted is alleged to be interstate commerce, and it is further alleged that· if the person to whom the live stock is consigned at Kansas City is not a member of the exchange, he is not permitted to and cannot sell or dispose of the stock at the Kansas City market, for the reason that the defendants, and all the other commission merchants, members of the exchange, refuse to buy live stock or in any manner negotiate or deal with or buy from a person or commission merchant who is not a member of the exchange, and thus the owner of live stock shipped to the Kansas City market is compelled to re-ship the same to other markets, and by reason of the unlawful combination existing among the defendants and the other members of the exchange the owner is prevented from delivering this stock at the Kansas City stock yards, and the sale of stock is thereby hindered and delayed, entailing extra expense and loss to the shipper, and placing an obstruction and· embargo on the marketing of all live stock shipped from the States and Territories to the Kansas City market which is not consigned to the stock yards company or to the defendants, or some of them, members of the stock exchange.

It is alleged that the defendants, as members of the exchange, have adopted certain rules, among them being rules 9 and 16, which are particularly alleged to be in restraint of trade and commerce between the States, and intended to create a monopoly, in contravention of the laws of the United States in that behalf.

Rule 9 provides as follows :

" SECTION 1. Commissions charged by members of this association for selling live stock shall not be less than the following named rates."

Sections 2, 3, 4, 5, 6 and 7 relate to the amounts of such commissions, and it is alleged that in some instances the commissions are greater than had theretofore been paid.

Section 8 permits the members to handle the business of

non-resident commission firms when the stock is consigned directly to or from such firm, at half the rates fixed by the rule, provided the non-resident commission firms are established at the markets named in the section.

Section 10 prohibits the employment of any agent, solicitor or employé except upon a stipulated salary not contingent upon the commissions earned, and it provides that not more than three solicitors shall be employed at one time by a commission firm or corporation, resident or non-resident of Kansas City.

Section 11 forbids any member of the exchange from sending or causing to be sent a prepaid telegram or telephone message quoting the markets or giving information as to the condition of the same, under the penalty of a fine as therein stated. The rule, however, permits prepaid messages to be sent to shippers quoting actual sales of their stock on the date made; also to parties desiring to make purchases on the market.

Rule 16 provides, in section 1, " That no member of the exchange shall transact business with any persons violating any of the rules or regulations of the exchange, or with an expelled or suspended member after notice of such violation, suspension or expulsion shall have been issued by the secretary or board of directors of the exchange."

It is alleged that the defendants in adopting these rules and in forming the exchange and carrying out the same have violated and are violating the statute of the United States, approved July 2, 1890, c. 647, 26 Stat. 209, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," and it is charged that it was the purpose of the defendants, in organizing the exchange and in adopting the rules mentioned, to prevent the shipment or consignment of any live stock to the Kansas City market unless it was shipped or consigned to the Kansas City stock yards and to some one or other of the defendants, members of the exchange, and to compel the shippers of live stock from other States and from the Territories to pay to the defendants the commissions and charges provided for in rule 9, and to prevent such shippers

from placing their property on sale at the Kansas City market unless these commissions were paid.

The answer of the defendants admitted their forming the exchange and becoming members thereof, and adopting, among others, the rules specially mentioned in complainants' bill. They denied that the exchange itself engaged in any business whatever, and alleged that it existed simply in order to prescribe rules and provide facilities for the transaction of business by the members thereof, and to govern them by such rules and regulations as have been evolved and sanctioned by the developments of commerce, and which are universally recognized to be just and fair to all concerned.

It was further set up in the answer that each member of the organization was in fact left free to compete in every manner, and by all means recognized to be fair and just, for his share of the business which comes to the point at which the members of the organization do business; that in adopting their rules they followed in all substantial respects the provisions which had been made upon the same subject respectively by the exchanges theretofore established at Chicago and East St. Louis, Illinois, and which have been since established at St. Louis, Omaha, Indianapolis, Buffalo, Sioux City and Fort Worth; and that the exchange at no time refused to admit as a member any reputable person who was willing to comply with the conditions of membership and to abide by the rules of the organization.

Various allegations in the bill as to the effect of the organization in precluding any sales or purchases of cattle other than by its members are denied.

The defendants also deny that the exercise of their occupation as commission merchants, doing business as members of the exchange, constitutes or amounts to interstate commerce, within the meaning of the Constitution or laws of the United States. They allege that they have no part in or control over the disposition of the live stock sold by them to others, nor of live stock purchased by them as commission merchants acting for others. They allege that the stock yards company permits any person whatsoever to transact business at its yards who

will pay the established charges of that company for its services, and that in point of fact a very large part of the business done at said yards is transacted by persons who are not members of the exchange, and without the interposition of such members. It is also alleged in their answer that they are under no obligations to extend the privileges of the exchange to a person who is not a member thereof, who has violated its rules and been suspended from membership, and who has voluntarily withdrawn therefrom, and announced his purpose to carry on his business as a competitor of the members of such exchange, to the destruction of said organization and its rules and to the injury of his competitors.

It is also set up that defendants cannot be compelled to deal with a non-member of their organization, or a person violating its rules, or with one who has been suspended for such violation, or who has withdrawn therefrom, or who has announced his intention to destroy said organization and to compete with the members thereof, and the defendants allege that they cannot be compelled to deal with any person whatsoever, and that they had a right to establish said exchange, and now have the right to maintain the same, and to require the observance of its rules and regulations on the part of their associates, so long as they desire to retain the privileges of membership in the body. They allege that their rules are in harmony with the rules and regulations of commercial exchanges which have existed for more than a hundred years, and which are now to be found in every State almost in the United States, and throughout the world, and that such rules and regulations are in all respects legal and binding. They deny all general and special allegations of illegal agreements, combinations or conspiracies to violate any law of the United States, or of the State of Kansas.

The complainants, in addition to their bill, used several affidavits, the tendency of which was to show that by virtue of the adoption of rules 9 and 16, the members of the exchange refused to deal with one who had violated a rule and had been suspended by reason thereof, and that by reason of this refusal to do business, the member thus suspended was

substantially incapacitated from carrying on his business as a commission merchant, and that by this combination defendants, in forming such rule and in adhering to it, have greatly injured the business of such member.

The defendants read counter-affidavits for the purpose of sustaining their answer, which were replied to by the complainants filing affidavits in rebuttal, and upon these affidavits and the pleadings above described an application for an injunction was made to the Circuit Court of the United States for the District of Kansas, First Division. That court, after argument, granted an injunction restraining the defendants from combining by contract, express or implied, so as by their acts, conduct or words to interfere with, hinder or impede others in shipping, trading, selling or buying live stock that is received from the States and Territories at the stock yards in Kansas City, Missouri, and Kansas City, Kansas; also enjoining them from acting under the rules of the exchange known as rules 9 and 16, and from attempting to impose any fines or penalties upon members for trading or offering to trade with any person respecting the purchase and sale of any live stock; and also from discriminating in favor of any member of the exchange because of such membership, and especially from discriminating against any person trading at the stock yards, and from refusing, by united or concerted action, or by word, persuasion, threat or by other means, to deal or trade with persons with respect to such live stock who are not members of the association, because they are not members of such association, or in any manner from interfering with the right and freedom of all and any persons trading or desiring to trade in such live stock at the stock yards, the same as if the exchange did not exist. The defendants were also enjoined from agreeing or attempting to limit the right of any person in business at the Kansas City stock yards to employ labor or assistance in soliciting shipments of live stock from other States or Territories, and from enforcing any agreement not to send prepaid telegrams from the stock yards to any other State or Territory.

The District Judge delivered an opinion upon granting the

injunction, which will be found reported in 82 Fed. Rep. 529. From the order granting it an appeal was taken by the defendants to the United States Circuit Court of Appeals for the Eighth Circuit, which court certified to this court certain questions under the provisions of section 6 of the act of March 3, 1891, and thereupon a writ of certiorari was issued from this court, and the whole case brought here for decision.

*Mr. L. C Krauthoff* for Hopkins and others.

*Mr. John S. Miller* filed a brief for same.

*Mr. Gustavus A. Koerner* filed a brief for same.

*Mr. Samuel W. Moore* for the United States. *Mr. Solicitor General* was on his brief.

MR. JUSTICE PECKHAM, after stating the case, delivered the opinion of the court.

The relief sought in this case is based exclusively on the act of Congress approved July 2, 1890, c. 647, entitled "An act to protect trade and commerce against unlawful restraints and monopolies," commonly spoken of as the Anti-Trust act. 26 Stat. 209.

The act has reference only to that trade or commerce which exists, or may exist, among the several States or with foreign nations, and has no application whatever to any other trade or commerce.

The question meeting us at the threshold, therefore, in this case is, what is the nature of the business of the defendants, and are the by-laws, or any subdivision of them above referred to, in their direct effect in restraint of trade or commerce among the several States or with foreign nations; or does the case made by the bill and answer show that any one of the above defendants has monopolized, or attempted to monopolize, or combined or conspired with other persons to monopolize, any part of the trade or commerce among the several States or with foreign nations?

That part of the bill which alleges that no one is permitted to do business at the cattle market at Kansas City unless he is a member of this exchange, does not mean that there is any regulation at the stock yards by which one who is not a member of the exchange is prevented from doing business, although ready to pay the established charges of the stock yards company for its services; but it simply means that by reason of the members of the exchange refusing to do business with those who are not members the non-member cannot obtain the facilities of a market for his cattle such as the members of the exchange enjoy. It is unnecessary at present to discuss the question whether there is any illegality in a combination of business men who are members of an exchange not to do business with those who are not members thereof, even if the business done were in regard to interstate commerce. The first inquiry to be made is as to the character of the business in which defendants are engaged, and if it be not interstate commerce, the validity of this agreement not to transact their business with non-members does not come before us for decision.

We come, therefore, to the inquiry as to the nature of the business or occupation that the defendants are engaged in. Is it interstate commerce in the sense of that word as it has been used and understood in the decisions of this court? Or is it a business which is an aid or facility to commerce, and which, if it affect interstate commerce at all, does so only in an indirect and incidental manner?

As set forth in the record, the main facts are that the defendants have entered into a voluntary association for the purpose of thereby the better conducting their business, and that after they entered into such association they still continued their individual business in full competition with each other, and that the association itself, as an association, does no business whatever, but is simply a means by and through which the individual members who have become thus associated are the better enabled to transact their business; to maintain and uphold a proper way of doing it; and to create the means for preserving business integrity in the transaction

of the business itself. The business of defendants is primarily and substantially the buying and selling, in their character as commission merchants, at the stock yards in Kansas City, live stock which has been consigned to some of them for the purpose of sale, and the rendering of an account of the proceeds arising therefrom. The sale or purchase of live stock as commission merchants at Kansas City is the business done, and its character is not altered because 'the larger proportion of the purchases and sales may be of live stock sent into the State from other States or from the Territories. Where the stock came from or where it may ultimately go after a sale or purchase, procured through the services of one of the defendants at the Kansas City stock yards, is not the substantial factor in the case. The character of the business of defendants must, in this case, be determined by the facts occurring at that city.

If an owner of cattle in Nebraska accompanied them to Kansas City and there personally employed one of these defendants to sell the cattle at the stock yards for him on commission, could it be properly said that such defendant in conducting the sale for his principal was engaged in interstate commerce? Or that an agreement between himself and others not to render such services for less than a certain sum was a contract in restraint of interstate trade or commerce? We think not. On the contrary, we regard the services as collateral to such commerce; and in the nature of a local aid or facility provided for the cattle owner towards the accomplishment of his purpose to sell them; and an agreement among those who render the services relating to the terms upon which they will render them is not a contract in restraint of interstate trade or commerce.

Is the true character of the transaction altered when the owner, instead of coming from Nebraska with his cattle, sends them by a common carrier consigned to one of the defendants at Kansas City with directions to sell the cattle and render him an account of the proceeds? The services rendered are the same in both instances, only in one case they are rendered under a verbal contract made at Kansas

City personally, while in the other they are rendered under written instructions from the owner given in another State. This difference in the manner of making the contract for the services cannot alter the nature of the services themselves. If the person, under the circumstances stated, who makes a sale of the cattle for the owner by virtue of a personal employment at Kansas City, is not engaged in interstate commerce when he makes such sale, we regard it as clear that he is not so engaged, although he has been employed by means of a written communication from the owner of the cattle in another State.

The by-laws of the exchange relate to the business of its members who are commission merchants at Kansas City, and some of these by-laws, it is claimed by the Government, are in violation of the act of Congress, because they are in restraint of that business which is in truth interstate commerce. That one of the by-laws which relates to the commissions to be charged for selling the various kinds of stock, is particularly cited as a violation of the act. In connection with that by-law it will be well to examine with some detail the nature of the defendants' business.

It is urged that they are active promoters of the business of selling cattle upon consignment from their owners in other States, and that in order to secure the business the defendants send their agents into other States to the owners of the cattle to solicit the business from them; that the defendants also lend money to the cattle owners and take back mortgages upon the cattle as security for the loan; that they make advances of a portion of the purchase price of the cattle to be sold, by means of the payment of drafts drawn upon them by the shippers of the cattle in another State at the time of the shipment. All these things, it is said, constitute intercourse and traffic between the citizens of different States, and hence the by-law in question operates upon and affects commerce between the States.

The facts stated do not, in our judgment, in any degree alter the nature of the services performed by the defendants, nor do they render that particular by-law void as in restraint

of interstate trade or commerce because it provides for a minimum amount of commissions for the sale of the cattle.

Objections are taken to other parts of the by-laws which we will notice hereafter.

Notwithstanding these various matters undertaken by defendants, we must keep our attention upon the real business transacted by them, and in regard to which the section of the by-law complained of is made. The section amounts to an agreement, and it relates to charges made for services performed in selling cattle upon commission at Kansas City. The charges relate to that business alone. In order to obtain it the defendants advance money to the cattle owner; they pay his drafts, and they aid him to keep his cattle and make them fit for the market. All this is done as a means towards an end; as an inducement to the cattle owner to give one of the defendants the business of selling the cattle for him when the owner shall finally determine to sell them. That business is not altered in character because of the various things done by defendants for the cattle owner in order to secure it. The competition among the defendants and others who may be engaged in it, to obtain the business, results in their sending outside the city, to cattle owners, to urge them by distinct and various inducements to send their cattle to one of the defendants to sell for them. In this view it is immaterial over how many States the defendants may themselves or by their agents travel in order to thereby secure the business. They do not purchase the cattle themselves; they do not transport them. They receive them at Kansas City, and the complaint made is in regard to the agreements for charges for the services at that point in selling the cattle for the owner. Thus everything at last centres at the market at Kansas City, and the charges are for services there, and there only, performed.

The selling of an article at its destination, which has been sent from another State, while it may be regarded as an interstate sale and one which the importer was entitled to make, yet the services of the individual employed at the place where the article is sold are not so connected with the subject sold as to make them a portion of interstate commerce, and a

combination in regard to the amount to be charged for such service is not, therefore, a combination in restraint of that trade or commerce. Granting that the cattle themselves, because coming from another State, are articles of interstate commerce, yet it does not therefore follow that before their sale all persons performing services in any way connected with them are themselves engaged in that commerce, or that their agreements among each other relative to the compensation to be charged for their services are void as agreements made in restraint of interstate trade. The commission agent in selling the cattle for their owner simply aids him in finding a market; but the facilities thus afforded the owner by the agent are not of such a nature as to thereby make that agent an individual engaged in interstate commerce, nor is his agreement with others engaged in the same business, as to the terms upon which they would provide these facilities, rendered void as a contract in restraint of that commerce. Even all agreements among buyers of cattle from other States are not necessarily a violation of the act, although such agreements may undoubtedly affect that commerce.

. The charges of the agent on account of his services are nothing more than charges for aids or facilities furnished the owner whereby his object may be the more easily and readily accomplished. Charges for the transportation of cattle between different States are charges for doing something which is one of the forms of and which itself constitutes interstate trade or commerce, while charges or commissions based upon services performed for the owner in effecting the sale of the cattle are not directly connected with, as forming part of, interstate commerce, although the cattle may have come from another State. Charges for services of this nature do not immediately touch or act upon nor do they directly affect the subject of the transportation. Indirectly and as an incident, they may enhance the cost to the owner of the cattle in finding a market, or they may add to the price paid by a purchaser, but they are not charges which are directly laid upon the article in the course of transportation, and which are charges upon the commerce itself; they are charges for the

facilities given or provided the owner in the course of the movement from the home *situs* of the article to the place and point where it is sold.

The contract condemned by the statute is one whose direct and immediate effect is a restraint upon that kind of trade or commerce which is interstate. Charges for such facilities as we have already mentioned are not a restraint upon that trade, although the total cost of marketing a subject thereof may be thereby increased. Charges for facilities furnished have been held not a regulation of commerce, even when made for services rendered or as compensation for benefits conferred. *Sands* v. *Manistee River Improvement Co.*, 123 U. S. 288; *Monongahela Navigation Co.* v. *United States*, 148 U. S. 312, 329, 330; *Kentucky & Indiana Bridge Company* v. *Louisville &c. Railroad*, 37 Fed. Rep. 567.

To treat as condemned by the act all agreements under which, as a result, the cost of conducting an interstate commercial business may be increased would enlarge the application of the act far beyond the fair meaning of the language used. There must be some direct and immediate effect upon interstate commerce in order to come within the act. The State may levy a tax upon the earnings of a commission merchant which were realized out of the sales of property belonging to non-residents, and such a tax is not one upon interstate commerce because it affects it only incidentally and remotely although certainly. *Ficklen* v. *Shelby County Taxing District*, 145 U. S. 1. Many agreements suggest themselves which relate only to facilities furnished commerce, or else touch it only in an indirect way, while possibly enhancing the cost of transacting the business, and which at the same time we would not think of as agreements in restraint of interstate trade or commerce. They are agreements which in their effect operate in furtherance and in aid of commerce by providing for it facilities, conveniences, privileges or services, but which do not directly relate to charges for its transportation, nor to any other form of interstate commerce. To hold all such agreements void would in our judgment improperly extend the act to matters which are not of an interstate commercial nature.

It is not difficult to imagine agreements of the character above indicated. For example, cattle, when transported long distances by rail, require rest, food and water. To give them these accommodations it is necessary to take them from the car and put them in pens or other places for their safe reception. Would an agreement among the landowners along the line not to lease their lands for less than a certain sum be a contract within the statute as being in restraint of interstate trade or commerce? Would it be such a contract even if the lands, or some of them, were necessary for use in furnishing the cattle with suitable accommodations? Would an agreement between the dealers in corn at some station along the line of the road not to sell it below a certain price be covered by the act, because the cattle must have corn for food? Or would an agreement among the men not to perform the service of watering the cattle for less than a certain compensation come within the restriction of the statute? Suppose the railroad company which transports the cattle itself furnishes the facilities, and that its charges for transportation are enhanced because of an agreement among the landowners along the line not to lease their lands to the company for such purposes for less than a named sum, could it be successfully contended that the agreement of the landowners among themselves would be a violation of the act as being in restraint of interstate trade or commerce? Would an agreement between builders of cattle cars not to build them under a certain price be void because the effect might be to increase the price of transportation of cattle between the States? Would an agreement among dealers in horse blankets not to sell them for less than a certain price be open to the charge of a violation of the act because horse blankets are necessary to put on horses to be sent long journeys by rail, and by reason of the agreement the expense of sending the horses from one State to another for a market might be thereby enhanced? Would an agreement among cattle drivers not to drive the cattle after their arrival at the railroad depot at their place of destination to the cattle yards where sold, for less than a minimum sum, come within the statute? Would an agreement among them-

selves by locomotive engineers, firemen or trainmen engaged in the service of an interstate railroad not to work for less than a certain named compensation be illegal because the cost of transporting interstate freight would be thereby enhanced? Agreements similar to these might be indefinitely suggested.

In our opinion all these queries should be answered in the negative. The indirect effect of the agreements mentioned might be to enhance the cost of marketing the cattle, but the agreements themselves would not necessarily for that reason be in restraint of interstate trade or commerce. As their effect is either indirect or else they relate to charges for the use of facilities furnished, the agreements instanced would be valid provided the charges agreed upon were reasonable. The effect upon the commerce spoken of must be direct and proximate. *New York, Lake Erie & Western Railroad* v. *Pennsylvania*, 158 U. S. 431, 439.

An agreement may in a variety of ways affect interstate commerce, just as state legislation may, and yet, like it, be entirely valid, because the interference produced by the agreement or by the legislation is not direct. *Sherlock* v. *Alling*, 93 U. S. 99–103; *United States* v. *E. C. Knight Company*, 156 U. S. 1, 16; *Pittsburg & Southern Coal Co.* v. *Louisiana*, 156 U. S. 590, 597; *Transportation Company* v. *Parkersburg*, 107 U. S. 691; *Ficklen* v. *Shelby County, supra*. Reasonable charges for the use of a facility for the transportation of interstate commerce have heretofore been regarded as valid in this court, even though such charges might necessarily enhance the cost of doing the business. *Packet Company* v. *St. Louis*, 100 U. S. 423; *Packet Company* v. *Catlettsburg*, 105 U. S. 559; *Transportation Company* v. *Parkersburg*, 107 U. S. 691; *Huse* v. *Glover*, 119 U. S. 543; *Ouachita Packet Company* v. *Aiken*, 121 U. S. 444; *St. Louis* v. *Western Union Telegraph Company*, 148 U. S. 92. An agreement among the owners of such facilities, to charge not less than a minimum rate for their use, cannot be condemned as illegal under the act of Congress.

The fact that the above cited cases relate to tangible property, the use of which was charged for, does not alter the

reasoning upon which the decisions were placed.   The charges were held valid because they related to facilities furnished in aid of the commerce and which did not constitute a regulation thereof.   Facilities may consist in privileges or conveniences provided and made use of or in services rendered in aid of commerce, as well as in the use of tangible property, and so long as they are facilities and the charges not unreasonable an agreement relating to their amount is not invalid.   The cattle owner has no constitutional right to the services of the commission agent to aid him in the sale of his cattle and the agent has the right to say upon what terms he will render them, and he has the equal right, so far as the act of Congress is concerned, to agree with others in his business not to render those services unless for a certain charge.   The services are no part of the commerce in the cattle.

In *Brown* v. *Maryland*, 12 Wheat. 419, Chief Justice Marshall, while maintaining the right of an importer to sell his article in the original package, free from any tax, recognized the distinction between the importer selling the article himself and employing an auctioneer to do it for him; and he said that in the latter case the importer could not object to paying for such services as for any other, and that the right to sell might very well be annexed to importation without annexing to it also the privilege of using auctioneers, and thus to make the sale in a peculiar way.   In such case a tax upon the auctioneer's license would be valid.

The same view is enforced in *Emert* v. *Missouri*, 156 U. S. 296.

The right of the cattle owners themselves to sell their own cattle is not affected or touched by the agreement in question, while the privilege of having their cattle sold for them at the market place frequented by defendants, and with the aid of one of them, is a privilege which they are charged for, and which is not annexed to their right to sell their own cattle.

It is possible that exorbitant charges for the use of these facilities might have similar effect as a burden on commerce that a charge upon commerce itself might have.   In a case

like that the remedy would probably be forthcoming.  *Transportation Co.* v. *Parkersburg*, 107 U. S. 691.  As was said by Mr. Justice Field, in *Sands* v. *Manistee River Improvement Co.*, 123 U. S. 288, 294, 295, "should there be any gross injustice in the rate of tolls fixed, it would not in our system of government, remain long uncorrected."

But whether the charges are or are not exorbitant is a question primarily of local law, at least in the absence of any superior or paramount law providing for reasonable charges. *Transportation Co.* v. *Parkersburg*, 107 U. S. 691.  This case does not involve that question.

If charges of the nature described do not amount to a regulation of interstate trade or commerce because they touch it only in an indirect and remote way, or else because they are in the nature of compensation for the use of property or privileges as a mere facility for that commerce, it would for a like reason seem clear that agreements relating to the amounts of such charges among those who furnish the privileges or facilities are not in restraint of that kind of trade.  While the indirect effect of the agreements may be to enhance the expense to those engaged in the business, yet as the agreements are in regard to compensation for privileges accorded for services rendered as a facility to commerce or trade, they are not illegal as a restraint thereon.

The facilities or privileges offered by the defendants are apparent and valuable.  The cattle owner has the use of a place for his cattle furnished by the defendants and all the facilities arising from a market where the sales and purchases are conducted under the auspices of the association of which the defendants are members, and in a manner the least troublesome to the owners and at the same time the most expeditious and effective.  Each of these defendants has the right to have the cattle which are consigned to him taken to the cattle yards, where, by virtue of the arrangements made by defendants with the owners of the yards, the cattle are placed in pens, watered and fed, if necessary, and a sale effected at the earliest moment.  It is these facilities and services which are paid for by a commission on the sale effected by the commission men.

If, as is claimed, the commission men sometimes own the cattle they sell, then the rules do not apply, for they relate to charges made for selling cattle upon commission and not at all to sales of cattle by their owners.

Definitions as to what constitutes interstate commerce are not easily given so that they shall clearly define the full meaning of the term. We know from the cases decided in this court that it is a term of very large significance. It comprehends, as it is said, intercourse for the purposes of trade in any and all its forms, including transportation, purchase, sale and exchange of commodities between the citizens of different States, and the power to regulate it embraces all the instruments by which such commerce may be conducted. *Welton v. Missouri,* 91 U. S. 275; *Mobile County v. Kimball,* 102 U. S. 691; *Gloucester Ferry Company v. Pennsylvania,* 114 U. S. 196; *Hooper v. California,* 155 U. S. 648, 653; *United States v. E. C. Knight Company,* 156 U. S. 1.

But in all the cases which have come to this court there is not one which has denied the distinction between a regulation which directly affects and embarrasses interstate trade or commerce, and one which is nothing more than a charge for a local facility provided for the transaction of such commerce. On the contrary, the cases already cited show the existence of the distinction and the validity of a charge for the use of the facility.

The services of members of the different stock and produce exchanges throughout the country in effecting sales of the articles they deal in are of a similar nature. Members of the New York Stock Exchange buy and sell shares of stock of railroads and other corporations, and the property represented by such shares of stock is situated all over the country. Is a broker whose principal lives outside of New York State, and who sends him the shares of stock or the bonds of a corporation created and doing business in another State, for sale, engaged in interstate commerce? If he is employed to purchase stock or bonds in a like corporation under the same circumstances, is he then engaged in the business of interstate commerce? It may, perhaps, be answered that stocks or

bonds are not commodities, and that dealers therein are not engaged in commerce. Whether it is an answer to the question need not be considered, for we will take the case of the New York Produce Exchange. Is a member of that body to whom a cargo of grain is consigned from a western State to be sold engaged in interstate commerce when he performs the service of selling the article upon its arrival in New York and transmitting the proceeds of the sale less his commissions? Is a New Orleans cotton broker who is a member of the Cotton Exchange of that city, and who receives consignments of cotton from different States and sells them on 'change in New Orleans and accounts to his consignors for the proceeds of such sales less his commission, engaged in interstate commerce? Is the character of the business altered in either case by the fact that the broker has advanced moneys to the owner of the article and taken a mortgage thereon as his security? We understand we are in these queries assuming substantially the same facts as those which are contained in the case before us, and if these defendants are engaged in interstate commerce because of their services in the sale of cattle which may come from other States, then the same must be said in regard to the members of the other exchanges above referred to. We think it would be an entirely novel view of the situation if all the members of these different exchanges throughout the country were to be regarded as engaged in interstate commerce, because they sell things for their principals which come from States different from the one in which the exchange is situated and the sale made.

The theory upon which we think the by-law or agreement regarding commissions is not a violation of the statute operates also in the case of the other provisions of the by-laws. The answer in regard to all objections is, the defendants are not engaged in interstate commerce.

But special weight is attached to the objection raised to section 11 of rule 9 of the by-laws, which provides against sending prepaid telegrams as set forth in the statement of facts herein. It is urged that the purpose of this section is to prevent the sending of prepaid telegrams by the defendants

to their various customers in the different States tributary to the Kansas City market, and that the section is a part of the contract between the members of the exchange, and is clearly an attempt to regulate and restrict the sending of messages by telegraph and telephone between citizens of the various States and Territories, and operates upon and directly affects the interstate business of communicating between points in different States by telegraph or telephone.

An agreement among the defendants to abstain from telegraphing in certain circumstances and for certain purposes is so clearly not an attempt to regulate or restrain the general sending of telegrams that it would seem unnecessary to argue the question. An agreement among business men not to send telegrams in regard to their business in certain contingencies, when the agreement is entered into only for the purpose of regulating the business of the individuals, is not a direct attempt to affect the business of the telegraph company, and has no direct effect thereon. Although communication by telegraph may be commerce, and if carried on between different States may be commerce among the several States, yet an agreement or by-law of the nature of the one under consideration is not a burden or a regulation of or a duty laid upon the telegraph company, and was clearly not entered into for the purpose of affecting in the slightest degree the company itself or its transaction of interstate commerce.

The argument of counsel in behalf of the United States, that because none of the States or Territories could enact any law interfering with or abridging the right of persons in Kansas or Missouri to send prepaid telegrams of the nature in question, therefore an agreement to that effect entered into between business men as a means towards the proper transaction of their legitimate business would be void, is, as we think, entirely unsound. The conclusion does not follow from the facts stated. The statute might be illegal as an improper attempt to interfere with the liberty of transacting legitimate business enjoyed by the citizen, while the agreement among business men for the better conduct of their own

business, as they think, to refrain from using the telegraph for certain purposes, is a matter purely for their own consideration. There is no similarity between the two cases, and the principle existing in the one is wholly absent in the other. The private agreement does not, as we have said, regulate commerce or impose any impediment upon it or tax it. Communication by telegraph is free from any burden so far as this agreement is concerned, and no restrictions are placed on the commerce itself.

The act of Congress must have a reasonable construction or else there would scarcely be an agreement or contract among business men that could not be said to have, indirectly or remotely, some bearing upon interstate commerce, and possibly to restrain it. We have no idea that the act covers or was intended to cover such kinds of agreements.

The next by-law which complainants object to is section 10 of the same rule 9, which prohibits the hiring of a solicitor except upon a stipulated salary not contingent upon commissions earned, and which provides that no more than three solicitors shall be employed at one time by a commission firm or corporation.

The claim is that these solicitors are engaged in interstate commerce, and that such commerce must be free from any state legislation and free from the control or restraint by any person or combination of persons. They also object that the rule is an unlawful inhibition upon the privilege possessed by each person under the Constitution to make lawful contracts in the furtherance of his business, and they allege that in this respect these members have surrendered their dominion over their own business and permitted the exchange to establish a species of regency, and that the by-law in regard to the employment of solicitors is one which directly affects interstate commerce.

*McCall* v. *California*, 136 U. S. 104, is cited for the proposition that the solicitors employed by these defendants are engaged in interstate commerce. In that case the railroad company was itself engaged in such commerce, and its agent in California was taxed by reason of his business in soliciting

for his company that which was interstate commerce. The fact that he did not sell tickets or receive or pay out money on account of it was not regarded as material. His principal was a common carrier, engaged in interstate commerce, and he was engaged in that commerce because he was soliciting for the transportation of passengers by that company through the different States in which the railroad ran from the State of California. In the case before us the defendants are not employed in interstate commerce but are simply engaged in the performance of duties or services relating to stock upon its arrival at Kansas City. We do not think it can be properly said that the agents of the defendants whom they send out to solicit the various owners of stock to consign the cattle to one of the defendants for sale are thereby themselves engaged in interstate commerce. They are simply soliciting the various stock owners to consign the stock owned by them to particular defendants at Kansas City, and until the arrival of the stock at that point and the delivery by the transportation company no duties of an interstate-commerce nature arise to be performed by the defendants. As the business they do is not interstate commerce, the business of their agents in soliciting others to give them such business is not itself interstate commerce. Not being engaged in interstate commerce, the agreement of the defendants through the by-law in question, restricting the number of solicitors to three, does not restrain that commerce, and does not therefore violate the act of Congress under discussion.

The position of the solicitors is entirely different from that of drummers who are travelling through the several States for the purpose of getting orders for the purchase of property. It was said in *Robbins* v. *Shelby County Taxing District*, 120 U. S. 489, that the negotiation of sales of goods which are in another State for the purpose of introducing them into the State in which the negotiation is made is interstate commerce.

But the solicitors for these defendants have no property or goods for sale, and their only duty is to ask or induce those who own the property to agree that when they send it to

market for sale they will consign it to the solicitor's princi-- pal, so that he may perform such services as may be neces-- sary to sell the stock for them and account to them for the proceeds thereof. Unlike the drummer who contracts in one State for the sale of goods which are in another, and which are to be thereafter delivered in the State in which the contract is made, the solicitor in this case has no goods or samples of goods and negotiates no sales, and merely seeks to exact a promise from the owner of property that when he does wish to sell he will consign to and sell the property through the solicitor's principal. There is no interstate com-- merce in that business.

*Hooper* v. *California*, 155 U. S. 648, is another illustration of the meaning of the term "commerce," as used in the Constitution of the United States. In that case, contracts of marine insurance are stated not to appertain to interstate commerce, and cases are cited upon the nature of the contract of insurance generally at page 653 of the opinion.

It is also to be remarked that the effect of the agreement as to the number of solicitors to be employed by defendants can only be remote and indirect upon interstate commerce. The number of solicitors employed has no direct effect upon the number of cattle transported from State to State. The solicitors do not solicit transportation of the cattle. They are not in the interest of the transportation company, and the transportation is an incident only. They solicit a consignment of cattle to their principals, so that the latter may sell them on commission and thus transact their local business. The transportation would take place any way and the cattle be consigned for sale by some one of the defendants or by others engaged in the business. It is not a matter of transportation but one of agreement as to who shall render the services of selling the cattle for their owner at the place of destination.

We say nothing against the constitutional right of each one of the defendants and each person doing business at the Kansas City stock yards to send into distant States and Territories as many solicitors as the business of each will warrant. This

original right is not denied or questioned. But cannot the citizen, for what he thinks good reason, contract to curtail that right? To say that a State would not have the right to prohibit a defendant from employing as many solicitors as he might choose, proves nothing in regard to the right of individuals to agree upon that subject in a way which they may think the most conducive to their own interests. What a State may do is one thing, and what parties may contract voluntarily to do among themselves is quite another thing.

The liberty of contract as referred to in *Allgeyer* v. *Louisiana*, 165 U. S. 578, is the liberty of the individual to be free, under certain circumstances, from the restraint of legislative control with regard to all his contracts, but the case has no reference to the right of individuals to sometimes enter into those voluntary contracts by which their rights and duties may properly be measured and defined and in many cases greatly restrained and limited.

We agree with the court below in thinking there is not the slightest materiality in the fact that the state line runs through the stock yards in question, resulting in some of the pens in which the stock may be confined being partly in the State of Kansas and partly in the State of Missouri, and that sales may be made of a lot of stock which may be at the time partly in one State and partly in the other. The erection of the building and the putting up of the stock pens upon the ground through which the state line ran were matters of no moment so far as any question of interstate commerce is concerned. The character of the business done is not in the least altered by these immaterial and incidental facts.

It follows from what has been said that the complainants have failed to show the defendants guilty of any violations of the act of Congress, because it does not appear that the defendants are engaged in interstate commerce, or that any agreements or contracts made by them and relating to the conduct of their business are in restraint of any such commerce.

Whether they refused to transact business which is not interstate commerce, except with those who are members of the exchange, and whether such refusal is justifiable or not,

are questions not open for discussion here. As defendants' actions or agreements are not a violation of the act of Congress, the complainants have failed in their case, and the order for the injunction must be

*Reversed and the case remitted to the Circuit Court of the United States for the District of Kansas, First Division, with directions to dismiss the bill with costs.*

MR. JUSTICE HARLAN dissented.

MR. JUSTICE MCKENNA took no part in the decision of this case.