GROSS INCOME TAX DIVISION,
STATE OF INDIANA *v.* J. L. COX AND SON.

[No. 28,480. Filed June 30, 1949.]

*J. Emmett McManamon,* Attorney General, *John J. McShane, Lloyd C. Hutchinson, Edward L. Hamilton,* Deputy Attorneys General, for appellant.

*H. Nathan Swaim* and *Claude H. Anderson* both of Indianapolis; and *Carll V. Kretsinger,* of Kansas City, Missouri, for appellee.

GILKISON, C. J.—Appellees brought this action to recover from appellant the sum of $3911.76 which appellant had required appellees to pay as gross income tax and interest, on March 1, 1945.

The issues consisted of the complaint and an answer under the rules.

The cause was tried by the court resulting in a finding and judgment for appellees in the sum of $3911.76

plus interest at the rate of 3% per annum from March 1, 1945. Appellant's motion for new trial, on the grounds: 1. That the decision of the court is not sustained by sufficient evidence, and 2, the decision of the court is contrary to law, was overruled, and this appeal was taken.

The record shows that while the cause was pending in the court below, plaintiff, J. L. Cox died July 4, 1946, and Leroy Cox as surviving partner was authorized to proceed with the action.

The evidence was by stipulation, except that given by a witness for appellees, named Morris Stout.

Among other things the stipulation and evidence show that appellees are a partnership, composed of Joseph L. and Leroy Cox, with their home office at Raytown, Missouri, and that the partners are residents of Missouri. That during the year 1943 there was constructed for Defense Plant Corporation two pipe lines, one a 24 inch line and the other a 20 inch line. The 20 inch line was located parallel and adjacent to the 24 inch line across Indiana. Both lines were built at the expense of the United States Government. A corporate entity, War Emergency Pipe Lines, Inc., acted for and on behalf of Defense Plant Corporation in supervising and in the construction of said lines. All the pipe and material used in the construction of these lines were manufactured outside of the state of Indiana. Engineers for the construction corporations selected convenient transfer points in Indiana to which the pipe and material concerned in this case, could be shipped by rail, which points are referred to as "railheads." From certain of these railheads, appellees were engaged to unload the pipe and material from the railroad cars, and then by trucks and tractors to haul it to, and string it along the pipe lines right of way in Indiana. This engagement was by letter as follows:

"March 29, 1943
In re:   File 52-2
Pipe Stringing

"J. L. Cox & Son
Raytown, Missouri

Gentlemen:

In confirmation of our recent discussion, we hereby request you to proceed in accordance with the provisions that appear in Supplement No. 14 to Tariff MF-I. C. C. No. 4 as published by Midwest Motor Carriers Bureau, Inc., to unload from railroad cars to temporary storage space when necessary and/or to unload to trucks from railroad cars or storage space or pipe-racks at railroad stations that will be designated by us from time to time, and to haul to, and string along, the pipeline right of way for that portion extending from Norris City, Illinois to Seymour, Indiana, of the 20-inch Products Pipeline which War Emergency Pipelines, Inc. is now building for and on behalf of Defense Plant Corporation, all of the pipe used in connection with construction of said section. In addition, from time to time you will be requested by us or by the contractors who will construct this portion of the pipe line to transport gate valves, fittings, river clamps and pipe coating used in connection with said construction work and are not handled and hauled by the contractor.

"All of the above services shall be performed in accordance with the rates, rules and regulations established by the above named tariff and as directed by proper representatives of War Emergency Pipelines, Inc., and/or the respective pipeline contractors. As has been customary with other pipe stringing activities on this project and as was contemplated when rates were established, all arrangements for temporary storage space shall be made by you and expenses incurred therefor shall be for your account.

"Please submit to War Emergency Pipelines, Inc., attention Traffic Department, P. O. Box 1638, Cincinnati, Ohio, seven copies of your invoices, accompanied by a like number of copies of bills of lading,

for all services performed under this letter of instruction.

> Yours very truly,
> WAR EMERGENCY PIPELINES, INC.
> By (Sgd.) A. N. Horne.

Appellees were selected and accepted by War Emergency Pipe Lines, Inc., one of the common carriers by Motor Vehicle, and were directed to unload the material from the railroad cars at the railheads in Indiana and to place it in temporary storage when necessary, at appellees' expense and to transport it to and string it along the pipelines right of way to be used in the construction of certain portions of the pipelines in Indiana, agreeable with the foregoing letter.

The gross income tax in question was taxed against the income derived by appellees from the service they rendered in unloading and transporting and stringing the materials used in the construction of portions of the pipelines located entirely within the confines of the state of Indiana from railheads located in Indiana.

Appellees held a certificate of public convenience and necessity issued to them February 4, 1942, by the Interstate Commerce Commission.

Upon completion of its contract in hauling materials from each railhead to the pipelines right of way, appellees submitted invoices to War Emergency Pipelines, Inc. based upon the weight of all materials transported and after approval of such inventories, War Emergency Pipelines, Inc. attached same to its remittance statements and forwarded them to the Federal Reserve Bank at Cincinnati, Ohio, with instructions to issue a check to appellees. Checks in payment were then sent to appellees at Raytown, Missouri by the bank.

For all their services, in so unloading, picking up, transporting and stringing such materials to that por-

tion of the pipelines right of way located in Indiana from railheads in Indiana, appellees were paid during 1943, the gross sum of $359,376.84. The gross income tax assessed by appellant against appellees thereon was $3588.77 with interest of $322.99, a total of $3911.76 which appellees paid under protest on March 1, 1945. Appellees filed a claim for refund of this money with interest on May 31, 1945, which was denied by appellant.

Authority in the nature of a permit was received from the state of Indiana, in addition to the Certificate of Public Convenience and Necessity issued by the Interstate Commerce Commission to appellees. All bills-of-lading were issued to Defense Plant Corporation or War Emergency Pipelines, Inc. as consignee. The consignor was either the various pipe companies that made the pipe, or War Emergency Pipelines, Inc. in each instance. Charges for the local transportation were based on weight plus appellees regularly filed tariff with Interstate Commerce Commission.

Appellees were not required to pay gross income tax to the state of Indiana for any hauling service from railheads outside the state of Indiana. Appellees had no resident agent representing them in Indiana, except as required by Interstate Commerce Commission.

Appellant contends that since all of the receipts of gross income of appellees, upon which the gross income tax was assessed and collected, were derived from activities, businesses and sources within the state of Indiana, occurring after the complete termination of the interstate transportation, that the right and duty of the state to impose the gross income tax is definitely fixed and established by the Indiana Income Tax law.

Burns' 1943 Replacement, § 64-2602 provides as follows:

"There is hereby imposed a tax upon the receipt of gross income, measured by the amount or volume

of gross income, and in the amount to be determined by the application of rates on such gross income as hereinafter provided. Such tax shall be levied upon the receipt of the entire gross income of all persons resident and/or domiciled in the state of Indiana, except as herein otherwise provided; *and upon the receipt of gross income derived from activities or businesses or any other source within the state of Indiana, of all persons who are not residents of the state of Indiana, and shall be in addition to all other taxes now or hereafter imposed with respect to particular privileges, occupations, and/or activities.* Said tax shall apply to, and shall be levied and collected upon, the receipt of all gross income received on or after the 1st day of May, 1933, with such exceptions and limitations as may be hereinafter provided." (Our italics).

It is appellees' contention that they were residents of the state of Missouri, and that during the time involved in this case, their activities, transactions and business, and their income received therefrom, were all from their engagements in interstate commerce in Indiana and that their income so received may not be taxed by appellant.

We think it is undoubtedly true that if appellees' transactions from which they received the income upon which the tax was assessed, were transactions in interstate commerce which it was the duty of Congress alone to regulate, no gross income tax could lawfully be assessed thereon. If they were not such transactions in interstate commerce, the tax was properly assessed. That is true because the states have surrendered to the United States Government the right and duty to regulate commerce among the several states. See clauses 3 and 18 of Art. 1, § 8, United States Constitution; *Gross Income Tax Division* v. *Strauss* (1948), 226 Ind. 329, 79 N. E. 2d 103, 104; *Freeman* v. *Hewit* (1946), 329 U. S. 249, 252, 67 S. Ct. 274, 91 L. Ed. 265, 271.

The gross income tax law of Indiana expressly ex-

empts from its burden, income received from interstate commerce "to the extent to which the state of ■ Indiana is prohibited from taxing such gross income by the Constitution of the United States of America." Clause (a), § 64-2606, Burns' 1943 Replacement (1947 Supp.) ; *Gross Income Tax Division* v. *Strauss, supra,* p. 104.

For many years the commerce clause of the Federal Constitution without the aid of Congressional legislation has afforded some protection from state legislation inimical to national commerce. In such cases, where Congress has not acted, the Supreme Court of the United States, not the state legislature, is, under the commerce clause, the final arbiter of competing demands of state and national interests. "Meanwhile Congress has accommodated its legislation, as have the states, to these rules as an established feature of our constitutional system. *There has thus been left to the states wide scope for the regulation of matters of local state concern, even though it in some measure affects the commerce, provided it does not materially restrict the free flow of commerce across state lines, or interfere with it in matters with respect to which uniformity of regulation is of predominant national concern."* See head notes 6 and 7, *Southern Pacific Co.* v. *Arizona* (1945), 325 U. S. 761, 769, 770, 89 L. Ed. 1924, 1925.

Interstate commerce is a term of such wide implications, and ramifications that the courts have carefully avoided any attempt to give it a comprehensive definition. *Gross Income Tax Division* v. *Strauss, supra,* 79 N. E. 2d p. 104; *Hopkins* v. *United States* (1898), 171 U. S. 578, 597, 43 L. Ed. 290, 298.

The Supreme Court of the United States, so far as we are informed, has seen fit to determine each case on its own facts, circumstances and general situation to

ascertain whether or not the particular transaction or activity is in interstate commerce to such an extent as to forbid the states to tax it. *Gross Income Tax Division* v. *Strauss, supra; Hopkins* v. *United States, supra,* U. S., p. 597, L. Ed., p. 298. Apparently it has been the intent of both the state courts and the United States Courts to harmonize the tax laws of the states with the positive demands of the commerce clause of the United States Constitution. In *McGoldrick* v. *Berwind-White Coal Min. Co.* (1939), 309 U. S. 33, 48, 84 L. Ed. 565, 571, Mr. Justice Stone, after giving a number of instances in which a tax may be lawfully levied by a state, notwithstanding it has an effect on commerce between the states, concludes thus:

> "In few of these cases could it be said with assurance that the local tax does not in some measure affect the commerce or increase the cost of doing it. But in them as in other instances of constitutional interpretation *so as to insure the harmonious operation of powers reserved to the states with those conferred upon the national government,* courts are called upon to reconcile competing constitutional demands, that commerce between the states shall not be unduly impeded by state action, and that the power to lay taxes for the support of state government shall not be unduly curtailed. See *Woodruff* v. *Parham,* 8 Wall. (US) 123, 131, 19 L. Ed. 382, 384; *Brown* v. *Houston,* 114 US 622, 29 L. Ed. 257, 5 S. Ct. 1091; *Galveston, H. & S. A. R. Co.* v. *Texas,* 210 US 217, 225, 227, 52 L. Ed. 1031, 1036, 1037, 28 S. Ct. 638; *South Carolina State Highway Dept.* v. *Barnwell Bros.* 303 US 177, 82 L. Ed. 734, 58 S. Ct. 510, *supra; Ford Motor Co.* v. *Beauchamp,* No. 17, October Term, 1939, decided December 11, 1939 (308 US 331, *ante,* 304, 60 S. Ct. 273); cf. *Metcalf & Eddy* v. *Mitchell,* 269 US 514, 523 et seq. 70 L. Ed. 384, 392, 46 S. Ct. 172; *Jackson County* v. *United States,* No. 14, October Term, 1939, decided December 18, 1939 (308 US 343, *ante,* 313, 60 S. Ct. 285)." (Our italics).

As supporting their position that their activities under their contract with War Emergency Pipe Lines, Inc. and all their income received therefrom were engagements in interstate commerce, appellees rely upon the decision in *Puget Sound Stevedoring Co.* v. *Tax Commission of the State of Washington et al.* (1937), 302 U. S. 90, 82 L. Ed. 68. In many respects that case presents facts similar to the case before us and the law there announced by Mr. Justice Cardozo is applicable in this case. However, in that case it is stated that the work done by the Stevedores was formerly done by the ship's crew. And so it was held that "The longshoreman busied in the same task bears the same relation as the crew to the commerce that he serves." But in that case the interstate or foreign commerce nature of the work was limited thus: "True the service did not begin or end at the ship's side, where the cargo is placed upon a sling attached to the ship's tackle. It took in the work of carriage to and from the 'first place of rest,' which means that it covered the space between the hold of the vessel and a convenient point of discharge upon the dock." In that case it was stipulated that, ". . . 'stevedoring services are essential to waterborne commerce, and always commence in the hold of the vessel and end at the 'first place of rest,' and vice versa,' " and the court said: "In such circumstances services beginning or ending in the hold or on the dock stand on the same plane for the purposes of this case as those at the ship's sling. The movement is continuous, is covered by a single contract, and is necessary in all its stages if transportation is to be accomplished without unusual impediments."

The court further said: "The business of loading and unloading being interstate or foreign commerce, the state of Washington is not at liberty to tax the privilege

of doing it by exacting in return therefor a percentage of the gross receipts. Decisions to that effect are many and controlling." (Many decisions) ". . . What is decisive is the nature of the act, not the person of the actor . . ." The court further said: "The business of appellant, in so far as it consists of supplying longshoremen to shipowners or masters without directing or controlling the work of loading or unloading, is not interstate or foreign commerce, but rather a local business, and subject, like such business generally, to taxation by the state."

The decree of the Supreme Court of Washington was held to be erroneous to the extent indicated "and no farther" and was modified accordingly.

We cannot say that a workman engaged in unloading freight from railroad cars that have been engaged in interstate commerce under employment of the consignee is in the same situation as one engaged in unloading freight from vessels engaged in interstate or foreign commerce under employment of the carrier. There seems to be a material difference in the historical custom and usage with respect to such activities, and that difference may well cause a different conclusion with respect to the right to tax wages received from the activity.

So far as we can learn it never has been the duty of train crews to unload the freight from loaded cars engaged in interstate transportation when they arrive at the point of destination. On the contrary that always has been and is now a duty of the consignee. Thus in overland transportation of freight in loaded cars it cannot be said that the unloading of the cars is a part of the transportation. It is otherwise with waterborne transportation as noted in the Puget Sound Stevedoring case. In this there is a controlling difference between that case and the case at bar. Following the reasoning in that case we must say

that, in unloading the freight cars at the railheads in Indiana, appellees were doing only that which their employer was required to do as the consignee of the freight, after its interstate transportation had ended, and it definitely had come to rest at the several railheads in Indiana. There was no element of interstate commerce in this activity of appellees or their employer. *New York ex rel. Pennsylvania R. Co.* v. *Knight* (1903), 192 U. S. 21, 26, 27, 48 L. Ed. 325, 327; *Maine* v. *The Grand Trunk Ry. Co.* (1891), 142 U. S. 217, 35 L. Ed. 994. See also *Central Greyhound Lines* v. *Mealey* (1947), 334 U. S. 653, 92 L. Ed. 1633. Wages received by appellees from this work are a proper subject for taxation under the Indiana Gross Income Tax law.

It is contended that the transportation of the freight by appellees by auto trucks from the freight cars or the points of storage at the railheads to the lines where the pipes were laid and the stringing of the pipe along the line in an appropriate position for putting it underground was a part of the interstate transportation. To ascertain whether this contention can be sustained we must look to the stipulation of facts. Stipulation VII contains this sentence: "All 'materials' were shipped to said railheads under bills of lading designating Defense Plant Corporation or War Emergency Pipelines, Inc., as consignees." Stipulation VIII contains this sentence: "At the time said 'materials' were ordered from the factories by War Emergency Pipelines, Inc., it was specified in a bill of lading that such 'materials' should be transported by rail to War Emergency Pipelines, Inc. at the designated railheads." It thus appears from the stipulation of facts that the bills of lading issued for all of the interstate shipments, made the railheads the point of destination for such shipments.

The contract of appellees with War Emergency Pipe Lines, Inc. consisting only of the letter, heretofore copied

in this opinion, in so far as it is for the transportation of freight from the railheads in Indiana to the pipelines site in Indiana, is not a contract in interstate commerce so far as the remuneration earned in Indiana therefrom is concerned. It is a local contract between appellees and War Emergency Pipe Lines, Inc. to do certain work in Indiana for an agreed price. The fact that neither of the parties to the contract are residents of Indiana; that appellees held a certificate of public convenience and necessity issued by the Interstate Commerce Commission, and that their remuneration was based upon Supplement No. 14 to Tariff MF-I. C. C. No. 4 as published by Midwest Motor Carriers Bureau, Inc., and that all remuneration checks were written by the Federal Reserve Bank at Cincinnati, Ohio, and mailed to appellees at Raytown, Missouri, do not make the transactions activities in Interstate Commerce. The thing that is decisive in this situation is the nature of the work done by appellees for their employer. *Puget Sound Stevedoring Co.* v. *Tax Commission, supra,* page 94, U. S., page 72, L. Ed. The transactions upon which the tax was assessed were activities and business performed wholly within the State of Indiana, and the tax is not discriminatory, but applies alike to both residents and nonresidents of the State, engaged in such work. *Nippert* v. *Richmond* (1945), 327 U. S. 416, 423, 424, 90 L. Ed. 760, 764; *McGoldrick* v. *Berwind-White Coal Min. Co., supra,* U. S. pp. 52, 58, L. Ed. pp. 574, 577.

The cause is reversed with instructions to the lower court to sustain the motion for new trial.

NOTE.—Reported in 86 N. E. 2d 693.