SNEAD v. CENTRAL OF GEORGIA RY. CO.

(Circuit Court, S. D. Georgia, E. D. March 25, 1907.)

1. CONSTITUTIONAL LAW—FINAL ARBITER—JUDICIAL AUTHORITY.
　　Whenever the rights of a party may be affected by a particular governmental act, whether it be an act of Congress or of the state Legislature, or of an executive or judicial functionary, either of the state or of the United States, if it be capable of submission at a court having jurisdiction, the final and common arbiter of the constitutional question is the supreme judicial authority of the courts of the United States.
　　[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, §§ 42, 123.]

2. SAME—LEGISLATIVE ACTS—PRESUMPTION OF VALIDITY.
　　There is a settled presumption in favor of the validity of every legislative act. Every reasonable judicial doubt must be resolved in favor of the law. The courts will decide that Congress has transcended its powers, only when that is so plain that they cannot avoid the duty.
　　[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, § 46.]

3. SAME—DUTY OF COURTS.
　　No higher duty rests upon the courts of the United States than to enforce the will of the legislative department of the government, as expressed in a statute, unless such statute be plainly and unmistakably in violation of the Constitution.
　　[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Constitutional Law, § 46.]

4. COMMERCE.
　　Definitions given.
　　[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Commerce, § 3.]

5. SAME—INSTRUMENTALITIES.
　　Employés of persons or corporations, engaged therein, are instrumentalities of commerce. Restrictive or benevolent regulation of those employés is within the power of Congress, which may be exercised to its utmost extent, and acknowledges no limitations other than those prescribed in the Constitution.

6. SAME—POWER OF CONGRESS.
　　Congress alone by legislation may occupy the whole field of interstate commerce.
　　[Ed. Note.—For cases in point, see Cent. Dig. vol. 10, Commerce, § 5.]

**7. Same.**

Illustrations of the exercise of this power by Congress enumerated, making clear that the words "to regulate" import the right and power to enact laws, and not merely to make rules and regulations.

**8. Same.**

When a corporation or other person engages in interstate or foreign commerce, eo instanti, the men who control it, and the corps of its employés, become subject to all those legitimate means which Congress may select for its regulation.

**9. Master and Servant—Negligence of Fellow-Servant.**

Reason for rule, denying to an employé the right to recover for injuries sustained by the negligence of a fellow-servant, in view of modern conditions, pronounced archaic.

**10. Commerce—Intrastate Commerce.**

The purpose of Congress being legitimate, and expressly relating to employés engaged in interstate or foreign commerce, it is immaterial to the validity of the act that somewhere in its operation it may have a casual or contingent effect upon the domain of state legislation.

[Ed. Note.—For cases in point, see Cent. Dig. vol. 44, States, § 2.]

**11. Same.**

Trade-Mark Cases, 100 U. S. 82, 25 L. Ed. 550, and Illinois Central Railroad Company v. McKendree (decided March 17, 1906) 27 Sup. Ct. 153, 203 U. S. 514, distinguished from the act in question.

**12. States—National and State Authority.**

The government of the United States, within the scope of its powers, operates upon every foot of territory in its jurisdiction. It legislates for the whole nation, and is not embarrassed by state lines. Here, however, no right proper to the state, or any of its instrumentalities of government, is drawn in question.

**13. Constitutional Law—Validity of Statute—Due Process of Law.**

The act considered held to be no deprivation of due process of law. Missouri Pacific Railroad Company v. Mackey, 8 Sup. Ct. 1161, 32 L. Ed. 107, 127 U. S. 205, followed.

**14. Master and Servant—Employer's Liability Act—Constitutionality of Statute.**

The act of Congress, approved June 11, 1906 (34 Stat. 232, c. 3073), entitled "An act relating to liability of common carriers in the District of Columbia and territories and common carriers engaged in commerce between the states and between the states and foreign nations to their employés," held to be constitutional.

(Syllabus by the Court.)

Action for damages under Act of Congress, approved June 11, 1906.

Alexander Akerman and John Randolph Cooper, for plaintiff.

Lawton & Cunningham, for defendant.

SPEER, District Judge.   The plaintiff is the widow and administratrix of Walter Snead, lately an employé of the Central of Georgia Railway Company.   She is a citizen of Georgia, and has brought an action against the Central of Georgia Railway Company, a Georgia corporation.   Her claim is for damages occasioned by the death of her husband.   He was a bridgeman employed by the defendant company, and at the time of his death was engaged in repairing a bridge upon a line of its railroad in the state of Alabama.   It is alleged that through the negligence of other employés of the company he was knocked from the bridge to the ground below and sustained injuries which resulted in his death.   No diversity of citizenship is alleged, and the jurisdiction

151 F.—39

of the court is invoked solely upon the authority of the act of Congress approved June 11, 1906 (34 Stat. 232, c. 3073), entitled "An act relating to liability of common carriers in the District of Columbia and territories and common carriers engaged in commerce between the states and between the states and foreign nations to their employés." This recent and most important legislation is popularly known as the "Employer's Liability Act." The language of that act material for our consideration is as follows:

"That every common carrier engaged in trade or commerce in the District of Columbia, or in any territory of the United States, or between the several states, or between any territory and another or between any territory or territories and any state or states, or the District of Columbia, or with foreign nations or between the District of Columbia and any state or states or foreign nations, shall be liable to any of its employés, or, in the case of his death, to his personal representative for the benefit of his widow and children, if any; if none, then for his parents; if none, then for his next of kin dependent upon him, for all damages which may result from the negligence of any of its officers, agents or employés, or by reason of any defect, or insufficiency due to its negligence in its cars, engines, appliances, machinery, track, roadbed, ways, or works.

"Sec. 2. That in all actions hereafter brought against any common carriers to recover damages for personal injuries to an employé, or where such injuries have resulted in his death the fact that the employé may have been guilty of contributory negligence shall not bar a recovery where his contributory negligence was slight and that of the employer was gross in comparison, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employé. All questions of negligence and contributory negligence shall be for the jury.

"Sec. 3. That no contract of employment, insurance, relief benefit, or indemnity for injury or death entered into by or on behalf of any employé, nor the acceptance of any such insurance, relief benefit, or indemnity by the person entitled thereto, shall constitute any bar or defense to any action brought to recover damages for personal injuries to or death of such employé. Provided, however, That upon the trial of such action against any common carrier the defendant may set off therein any sum it has contributed toward any such insurance, relief benefit, or indemnity that may have been paid to the injured employé or, in case of his death, to his personal representative."

To the declaration of the plaintiff the defendant has demurred upon several grounds: (1) Because the act is not a regulation of commerce within the meaning of the commerce clause of the Constitution; (2) because said act, if it be a regulation of commerce, is not limited to commerce with foreign nations, or among the several states or with the Indian tribes, but extends as well to intrastate commerce; (3) because interstate and intrastate employés are so commingled by this act that it is impossible to make it apply only to interstate employés, unless the court reads into the act something which Congress has not put there, and this the court may not do; (4) because it is a violation of the fifth amendment to the Constitution, which provides that "no person shall be deprived of life, liberty, or property, without due process of law."

This demurrer draws in question the power and authority of the national Congress to enact a law, which in the minds of the plaintiff and her counsel has justified her action. It is perhaps difficult to magnify unduly the significant and consequential import of the question thus presented. Every corporation and person in the states and territories engaged in commerce between the states, or between the states and

foreign nations, may be profoundly concerned. More immediate perhaps is the interest of more than a million of our countrymen, the employés of the railway and other corporations who serve the public and their employers in the mightiest, and—after agriculture—the most indispensable among the physical labors of civilized men. The settled policy of a great nation on this stupendous topic is at stake. The validity of a deliberate enactment of the national Legislature is drawn in question for determination by the final arbiter of the American system of government. Where reposes the august power of such final arbitrament? On a previous occasion I have attempted to answer. "Whenever the rights of the citizen may be affected by a particular governmental act, whether it be an act of Congress or of the state Legislature, or of an executive or judicial functionary, either of the state or of the United States if it be capable of submission to a court having jurisdiction, the final and common arbiter of the constitutional question is the supreme judicial authority of the courts of the United States." In such cases the final decision of that authority is binding upon all the people, all the states, and all the departments of the general government. It is this magnificent significance of judicial power and usefulness which dignifies our government over that of every other nation. Lord Chatham declared of the British Constitution:

"The poorest man may in his cottage bid defiance to all the forces of the crown. It may be frail, its roof may shake, the wind may blow through it, the storm may enter, but the King of England cannot enter. All his forces dare not cross the threshold of the ruined tenement."

But not so of the legislative power; for, said Mr. Phelps, in his eulogy of our Supreme Court:

"The great orator could go no further. He could not say the British Parliament might not enter the home of the subject, for all the judges of England are powerless in the face of an act of Parliament whatever it may be. It was reserved for the American Constitution to extend the judicial protection of personal rights, not only against the rulers of the people, but against the representatives of the people. And," continued that great American lawyer, "judges will be appointed and will pass away, one generation rapidly succeeding another; but whoever comes, and whoever goes, the court remains. Strong in its traditions, consecrated by its memories, fortified with the steadfast purpose of the profession that surrounds it, anchored in the abiding trust of its countrymen, the great court will go on, and still go on, keeping alive through many a century that we shall not see the light that burns with constant radiance upon the high altar of American constitutional justice." Speer's Lectures on the Constitution, J. W. Burke Co., Macon, Ga., pp. 101–103.

While this is true, and while it is also true, as De Tocqueville declared, that "a more imposing judicial power was never constituted by any people," in all our history the occasions when the action of Congress or the executive have been declared unconstitutional are singularly and happily infrequent. This is indeed inevitable from the division and co-ordination of our governmental power. There is a settled presumption in favor of the validity of every legislative act. This perhaps was originally ascribable to the lofty and even plane of intelligence, patriotism, and statesmanship discoverable from the earliest period of our history in the national Legislature. It is probable that in other times a few great men of distinguishing individuality were more conspicuous in that body than at present. It is also probable that at no other period

has there been an average plane of intelligence, of careful education, of knowledge, of historical information, or familiarity with present conditions, and of keen perspicacity of those measures essential for the welfare of the people than that which exists today in our Congress. Nor is it less persuasive of the validity of national legislation that the executive and his constitutional advisers are regarded as worthy prescient colaborers with Congress in the recommendation and approval of such measures.

Whatever the reason, certain it is that the rule exists that courts will not adjudge an act of Congress invalid, unless in their judgment its violation of the Constitution is clear, complete, and unmistakable. Every reasonable judicial doubt must be resolved in favor of the law. Even where the legislation is annulled the Supreme Court has given unequivocal expression to this doctrine. In the Trade-Mark Cases, 100 U. S. 96, 25 L. Ed. 550, Associate Justice Miller, rendering the opinion, observed:

"When this court is called on in the course of the administration of the law to consider whether an act of Congress or of any other department of the government is within the constitutional authority of that department a due respect for the co-ordinate branch of the government requires that we shall decide it has transcended its powers only when that is so plain that we cannot avoid the duty." Justice Miller further observed that one "will count, as he may do on his fingers, the instances in which this court has declared an act of Congress void for want of constitutional power."

And again, in the case of the United States v. Harris, 106 U. S. 635, 1 Sup. Ct. 606, 27 L. Ed. 290, Mr. Justice Wood said:

"Proper respect for a co-ordinate branch of the government requires the courts of the United States to give effect to the presumption that Congress will pass no act not within its constitutional power. This presumption should prevail unless the lack of constitutional authority to pass an act in question is clearly demonstrated."

The principle is otherwise expressed in the famous case of the Northern Securities Co. v. United States, 193 U. S. 350, 24 Sup. Ct. 462, 48 L. Ed. 679. There Mr. Justice Harlan declares:

"No higher duty rests upon this court than to enforce, by its decrees, the will of the legislative department of the government, as expressed in a statute, unless such statute be plainly and unmistakably in violation of the Constitution."

It is obvious that these cardinal principles of constitutional determination must be steadily held in mind while the question here involved is under consideration.

The impeachment of this legislation is based upon the following material contentions: First, because the subject-matter sought to be regulated is not commerce, or the law a proper regulation of such commerce; and, second, because it involves an unwarrantable effort to regulate intrastate commerce, over which Congress has no power. A superficial conception of the term "commerce" may lead to conclusions as fallacious as they are inimical to the proper solution of these great questions about which the country is now concerned. The term, as used in the Constitution, has been repeatedly interpreted by the courts. Said Chief Justice Marshall, in Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23:

"Commerce, undoubtedly, is traffic, but it is something more—it is intercourse. It describes the commercial intercourse between nations, and parts of nations, in all its branches, and is regulated by prescribing rules for carrying on that intercourse."

More detail is afforded by the definition of Mr. Justice Johnson in his concurring opinion in the same case (page 229 of 9 Wheat., page 23 of 6 L. Ed.):

"Commerce, in its simplest signification, means an exchange of goods; but, in the advancement of society, labor, transportation, intelligence, care, and various mediums of exchange become commodities, and enter into commerce. The subject, the vehicle, the agent, and the various operations become the objects of commercial regulation."

"Commerce," declared Mr. Justice Field, in Welton v. State of Missouri (91 U. S. 280, 23 L. Ed. 347), "is a term of the largest import. It comprehends intercourse for the purposes of trade in any and all its forms, including the transportation, purchase, sale, and exchange of commodities. * * *" Additional definitions may be found in Smith v. Turner, 7 How. 401, 12 L. Ed. 702; State Freight Tax Case, 15 Wall. 284, 21 L. Ed. 164; Chicago R. Co. v. Fuller, 17 Wall. 568, 21 L. Ed. 710; Pensacola Tel. Co. v. Western Union Tel. Co., 96 U. S. 9, 24 L. Ed. 708; Mobile Co. v. Kimball, 102 U. S. 702, 26 L. Ed. 238; Gloucester Ferry Co. v. Pennsylvania, 114 U. S. 204, 5 Sup. Ct. 826, 29 L. Ed. 158; Addyston Pipe Co. v. U. S., 175 U. S. 241, 20 Sup. Ct. 96, 44 L. Ed. 136.

It follows that from Chief Justice Marshall we learn that it means commercial intercourse in all its branches, and that it is regulated by prescribing rules for carrying on that intercourse. It is very clear that such rules can be corrective in a restricted sense only, if confined to the material commodities transported, sold, or exchanged. This is not enough. They must operate on men. That they affect passengers can scarcely be denied. This has been established by legislation and by the courts, but the great Chief Justice extends the meaning of the word to all its branches. How futile and unworthy the attention of government would be this provision of the organic law did it fail to affect the individuals for whom, by whom, and at whose instance, commercial intercourse is carried on.

The persons who are concerned or affected by commerce may be classified as follows: (1) Persons as commodities of commerce, such as passengers and immigrants; (2) persons who are the instrumentalities of commerce, such as pilots, engineers, and mariners on vessels, railway operatives on land, and others whose business is interstate or foreign commerce; (3) persons who thus employ, and set commerce in motion. These are the men who create and continue to operate the great lines or channels of commercial intercourse. It is, then, wholly impossible in a constitutional sense, or in legislative contemplation, to separate the men who are the instrumentalities and active agents of that commerce which the national government may control from the restrictive or benevolent regulation within the purview of that power which the framers of the Constitution conferred upon Congress. In a word, the commodities of commerce, whether animate or inanimate,

cannot be moved for the trade of the world without men. To direct and to protect such men is within the domain of legislative regulation. The employés of those persons or corporations which are engaged in interstate or foreign commerce are then within the regulative power of Congress, and that power, said Chief Justice Marshall, "is to prescribe the rule by which commerce is to be governed, and like all others vested in Congress, is complete in itself, may be exercised to its utmost extent, and acknowledges no limitations other than those prescribed in the Constitution." In behalf of such employés the law under consideration was enacted.

It should be noted also that the courts have universally held that the power to regulate embraces all the instrumentalities by which commerce may be conducted. Welton v. Missouri, supra; Pacific Coast S. S. Co. v. Board of R. R. Com'rs (C. C.) 18 Fed. 11; Sherlock v. Alling, 93 U. S. 104, 23 L. Ed. 819; United States v. Joint Traffic Ass'n, 171 U. S. 569, 19 Sup. Ct. 25, 43 L. Ed. 259; Hopkins v. United States, 171 U. S. 597, 19 Sup. Ct. 40, 43 L. Ed. 290. Said Mr. Justice Field, in Gloucester Ferry Co. v. Pennsylvania, supra, page 203 of 114 U. S., page 828 of 5 Sup. Ct., 29 L. Ed. 158:

"The power to regulate * * * is the power to prescribe the rules by which [commerce] shall be governed; that is, the conditions upon which it shall be conducted—to determine when it shall be free, and when subject to duties or other exactions. The power also embraces within its control all the instrumentalities by which that commerce may be carried on, and the means by which it may be aided and encouraged."

The power to regulate applies as well to traffic on water as to traffic on land, and while some regulations have been ascribed to the law of the admiralty, which is of full force not only upon the seas but on the interior lakes and navigable waterways of the United States, it is yet clear that much legislation for the direction and protection of the instrumentalities of this maritime trade finds its authority in the commerce clause which we are discussing. Said Mr. Justice Clifford, in State Tonnage Tax Cases, 12 Wall. 216, 20 L. Ed. 370:

"Unquestionably, the power to regulate commerce includes navigation as well as traffic in its ordinary signification, and embraces ships and vessels as the instruments of intercourse and trade, as well as the officers and seamen employed in their navigation."

This language is reiterated in Hall v. De Cuir, 95 U. S. 494, 24 L. Ed. 547, and in other cases. The officers and seamen then are deemed and held to be as much the instruments of such intercourse and trade as the ships and vessels. It is also established that the powers thus granted are not confined to the instrumentalities of commerce as they were known or in use when the Constitution was adopted. In Pensacola Telegraph Co. v. Western Union Telegraph Co., 96 U. S. 9, 24 L. Ed. 708, it was said by Chief Justice Waite:

"They extend from the horse with its rider to the stagecoach, from the sailing vessel to the steamboat, from the coach and the steamboat to the railroad, and from the railroad to the telegraph, as these new agencies are successively brought into use to meet the demands of increasing population and wealth. They were intended for the government of the business to which they relate at all times and under all circumstances."

And said Mr. Justice Brewer in the famous case of In re Debs, 158 U. S. 591, 15 Sup. Ct. 909, 39 L. Ed. 1092:

"Constitutional provisions do not change, but their operation extends to new matters as the modes of business and the habits of life of the people vary with each succeeding generation. The law of the common carrier is the same to-day as when transportation on land was by coach and wagon, and on water by canal boat and sailing vessel, yet in its actual operation it touches and regulates transportation by modes then unknown—the railroad train and the steamship. The Constitution has not changed. The power is the same. But it operates to-day upon modes of interstate commerce unknown to the fathers, and it will operate with equal force upon any new modes of such commerce which the future may develop."

It is true that the extension of the elastic but indestructible powers to regulate interstate and foreign commerce has been slow and gradual. It has, however, kept pace with the evolution of the great force of civilization it was designed to control. It has been as steadily resisted by that school of constructionists who believe, as stated by Justice Miller in Ex parte Yarborough, 110 U. S. 658, 4 Sup. Ct. 155, 28 L. Ed. 274, in "the old argument, often heard, often repeated, and in this court never assented to, that when a question of the power of Congress arises the advocate of the power must be able to place his finger on words which expressly grant it." It is equally true that the conservative efforts of the skillful logicians of this school have been of undoubted service to the country. They have obliged the most careful contemplation of the legality and the wisdom of every advancing step. To change the metaphor, the vis inertia they have exerted has performed the salutary functions of a brake upon the car of progress. On occasion, possibly, the brake has been applied when the car was heavily freighted with the hopes of the nation, and toiling painfully up hill, but its progression has been found irresistible. An illustration may be found in the gradual but expanding utilization of the commerce clause in its application to the instrumentalities of navigation. In the Lottawanna, 21 Wall. 577, 22 L. Ed. 654, on this topic it was held:

"Congress undoubtedly has authority under the commercial power, if no other, to introduce such changes as are likely to be needed. The scope of the maritime law, and that of commercial regulation, are not coterminous, it is true, but the latter embraces much the largest portion of ground covered by the former. Under it Congress has regulated the registry, enrollment, license, and nationality of ships and vessels; the method of recording bills of sale and mortgages thereon; the rights and duties of seamen; the limitations of the responsibility of ship owners for the negligence and misconduct of their captains and crews; and many other things of a character truly maritime."

Here also Mr. Justice Bradley delivered the opinion of the court. On page 575 of 21 Wall., page 654 of 22 L. Ed., this great jurist speaks of the "uniformity and consistency at which the Constitution aimed on all subjects of a commercial character affecting the intercourse of the States with each other or with foreign states." Pursuant to this power the Congress therefore has prescribed rules which include the control of vessels engaged in commerce and these are as well applicable to vessels engaged only in intrastate commerce as to those engaged in interstate traffic, in the case of steamboats, the inspection of their hulls and boilers, the licensing of their officers, the carrying of prescribed lights and giving and answering prearranged signals, the

maintenance of means for the preservation of life, life preservers, life rafts, and the like. In the Hazel Kirke (D. C.) 25 Fed. 607, the necessity of this unlimited control is stated:

"Manifestly it is not possible for Congress to fully control and adequately protect commerce with foreign nations and among the several states, when that commerce is pursued by means of vessels navigating the public waters of the United States, without controlling the navigation of all vessels navigating such waters, not only those engaged in commerce with foreign nations and among the several states, but those engaged in domestic commerce, and those engaged in no commerce at all, like the yachts. Accordingly Congress has undertaken to regulate the lights to be carried by all vessels navigating such waters, and the courses to be pursued by all vessels meeting upon such waters, and these regulations are supreme and binding upon all vessels there navigating, because only by controlling in those particulars the navigation of all vessels navigating such waters, can the safe navigation of vessels engaged in interstate or foreign commerce upon such waters be secured."

This control also extends to the control of persons transported in interstate and foreign commerce. That it relates to passengers thus transported will not be denied. It has been held that an act to regulate immigration which levied a duty for every passenger coming from a foreign port to this country is proper under the commerce clause. The Head Money Cases, 112 U. S. 580, 5 Sup. Ct. 247, 28 L. Ed. 798. It has established qualifications and conditions for masters, engineers, pilots of vessels. It has enacted categorical rules comprehending the rights and duties of seamen and owners of vessels. It has regulated shipping articles, the method of their treatment, and the protection of their health while on board ship. This is established by numerous authorities. The Barque Chusan, 2 Story, 455, Fed. Cas. No. 2,717; The Katie (D. C.) 40 Fed. 492, 7 L. R. A. 55, 7 Cyc. 461; In re Vessels Owners Towing Company, 26 Fed. 170. Said the Supreme Court in Cooley v. Board of Wardens, 12 How. 315, 13 L. Ed. 996:

"When we look to the nature of the service performed by pilots, to the relations which that service and its compensations bear to navigation between the several states, and between the ports of the United States and foreign countries, we are brought to the conclusion that the regulation of the qualifications of pilots, of the modes and times of offering and rendering their services, * * * and of the penalties by which their rights and duties may be enforced, does constitute regulations of navigation, and consequently of commerce, within the just meaning of this clause of the Constitution."

For authorities on this subject, see 8 Fed. Stat. Ann. 408.

If then Congress has the established right to control the relative duties of the ship owners and the seamen, both of whom are instrumentalities of commerce, both absolutely essential to its proper and effective conduct, or any conduct, upon what sound reasoning can its control of the rights and liabilities of other men engaged in the transportation by land of the same commerce be denied? The employés of a railroad company are essential instruments to the existence under modern conditions of interstate traffic on land. The locomotive engineers, the firemen, the train hands, the track hands, the conductors, and all the rest are as essential to this traffic as are the masters, pilots, engineers, and sailors to navigation. The power to regulate, as we have heretofore seen, is unlimited in its application to such traffic. How narrow then is the contention that this regulation may be extended to the inanimate

machinery and commodities engaged, and not to the men without whose services not a wheel would revolve and not an ounce of freight would be transported.

Said Mr. Justice Bradley in Stockton v. Baltimore & N. Y. R. Co. (C. C.) 32 Fed. 16:

"With regard to commerce, it has been expressly held that it is not confined to commercial transactions, but extends to seamen, ships, navigation, and the appliances and facilities of commerce. And it must extend to these, or it cannot embrace the whole subject. Under this power, the navigation of rivers and harbors has been opened and improved, and we have no doubt that canals and waterways may be opened to connect navigable bays, harbors, and rivers with each other, or with the interior of the country. Nor have we any doubt that, under the same power, the means of commercial communication by land as well as by water may be opened up by Congress between different states, whenever it shall see fit to do so, either on failure of the states ·to provide such communication, or whenever, in the opinion of Congress, increased facilities of communication ought to exist."

In the presence of such tremendous physical demonstration of this truth as the transcontinental railways, builded largely from the public resources and chartered by Congress, and the work of constructing the Isthmian Canal, the soundness of the views of that great jurist will scarcely be questioned.

In the subsequent case of California v. Pacific Railroad Company, 127 U. S. 39, 8 Sup. Ct. 1080, 32 L. Ed. 150, Justice Bradley further observes:

"The power to construct, or to authorize individuals or corporations to construct, national highways and bridges from state to state is essential to the complete control and regulation of interstate commerce. Without authority in Congress to establish and maintain such highways and bridges, it would be without authority to regulate one of the most important adjuncts of commerce. * * * Of course the authority of Congress over the territories of the United States, and its power to grant franchises exercisable therein are, and ever have been, undoubted. But the wider power was very freely exercised, and much to the general satisfaction, in the creation of the vast system of rail roads connecting the East with the Pacific, traversing states as well as territories and employing the agency of state as well as federal corporations."

This language is approved without reservation, and applied to railroads by the Supreme Court in the case of Cherokee Nation v. Kansas Railroad, 135 U. S. 658, 10 Sup. Ct. 971, 34 L. Ed. 295. There the court was unanimous, and said Justice Harlan, mouthpiece:

"The question is no longer an open one as to whether a railroad is a public highway, established primarily for the convenience of the people and to subserve public ends, and, therefore, subject to governmental control and regulation."

Congress then may not only create railroads, pay for their construction and maintenance, but it may control those which are chartered by the states, and which engage in the commerce over which the national authority is paramount. Congress alone by legislation may occupy the whole field of interstate commerce. The Lottery Cases, 188 U. S. 321, 23 Sup. Ct. 321, 47 L. Ed. 492. It is true that the states may charter corporations to engage in this business. It is true that Congress by its acquiescence may permit their operation. But when it chooses to act, the authority granted by the state, when in conflict with

the national law, is obliterated, and the latter is written in letters of enduring light on the page from which the local enactments have been erased. Upon this subject the authorities are numerous. Lake Shore & M. S. R. Co. v. Ohio, 173 U. S. 297, 298, 19 Sup. Ct. 465, 43 L. Ed. 702.

A familiar illustration is near at hand. By virtue of state authority several railroads had constructed bridges for their highways across the navigable river upon which this city is situated. The steamboats plying the lower river were thus forbidden access to their wharves. The national government since its organization had been silent. It finally thought proper to act. The railroads were then informed that, unless suitable drawbridges were constructed so that steamers might pass through unhindered, their bridges would be removed. In other words, the dormant power of the Constitution was aroused, and the railroads, the creatures of the state, whose action had been theretofore lawful, turned the listening ear and caught the words of that mandate and swiftly obeyed. The creation of the Interstate Commerce Commission; the enactment against arbitrary and discriminating rates of the anti-trust law forbidding combinations in restraint of trade, held directly applicable to railroads, even though chartered by the states; the law denouncing rebates, and forbidding passes in interstate traffic; the law forbidding a railroad engaged in such commerce from dealing in commodities like coal, which it transports (Railway v. I. C. C., 200 U. S. 361, 26 Sup. Ct. 272, 50 L. Ed. 515); all such legislation culminating in the power exercised by the most recent enactment, intrusting the commission, which is the agent of Congress, with the power to fix rates, and the bill to promote the safety of employés and travelers upon railroads by limiting the hours of service of employés thereon, enacted in the closing hours of the last session—are familiar illustrations of the exercise of the right and power of Congress to control such commerce. It is not difficult to foresee that this power may speedily be extended to reach and to paralyze the action of those daring financiers who water the stock of corporations engaged in interstate traffic, and who by this perilous expedient not only compel the public to pay interest upon evidences of fictitious values thus created, but endanger the stability of all business by the panics they engender and the calamities they threaten. In the meaning of the commerce clause, it is thus made clear that the words "to regulate" impart the right and power to enact laws, and not merely to make rules and regulations. The necessity for such right and such power, more than all things else contributed to the very establishment of the government of the United States itself. Said Chief Justice Marshall in Brown v. Maryland, 12 Wheat. 444, 6 L. Ed. 678:

"The oppressed and degraded state of commerce previous to the adoption of the Constitution can scarcely be forgotten. It was regulated by foreign nations with a single view to their own interests; and our disunited efforts to counteract their restrictions were rendered impotent by want of combination. Congress, indeed, possessed the power of making treaties; but the inability of the federal government to enforce them had become so apparent as to render that power in a great degree useless. Those who felt the injury arising from this state of things, and those who were capable of estimating the influence of commerce on the prosperity of nations, perceived the necessity of giving the

control over this important subject to a single government. It may be doubted whether any of the evils proceeding from the feebleness of the federal government contributed more to that revolution which introduced the present system, than the deep and general conviction that commerce ought to be regulated by Congress. It is not, therefore, matter of surprise, that the grant should be as extensive as the mischief, and should comprehend all foreign commerce and all commerce among the states. To construe the power so as to impair its efficacy would tend to defeat an object, in the attainment of which the American public took, and justly took, that strong interest which arose from a full conviction of its necessity."

This power exists in all the pristine vitality in which it was implanted in the organic law. That law does not profess to enumerate all the means by which its powers may be executed. In the nature of things such enumeration was impossible. Said Chief Justice Marshall in Martin v. Hunter, 1 Wheat. 326, 4 L. Ed. 97:

"The Constitution unavoidably deals in general language. It did not suit the purposes of the people, in framing this great charter of our liberties, to provide for minute specifications of its powers, or to declare the means by which those powers should be carried into execution."

Specification of the means for its proper control have enlarged with the evolution of the nation. In the creation of national banks, in authorizing corporations for the building and maintenance of bridges and highways, in the erection of lighthouses, in the annual expenditure of millions for the improvement of the interior waterways, the exterior harbors and the channels of access thereto, and in many other ways Congress has defined and utilized such means. In the well-known case of United States v. Greene and Gaynor (D. C.) 146 Fed. 803, it was held that the power of Congress to regulate and improve navigable water found its authority under the commerce clause. It follows that when a corporation or other person engages in this commerce, eo instanti the men who control it and the corps of its employés become subject to all of those legitimate means which Congress may select for its regulation.

Nor is the enactment of such measures as that under consideration a novel or unusual power on the part of government. Our own state, it seems, was the pioneer in a measure of partial relief from that strict rule which was first enunciated in England in 1837, which forbade the recovery by an employé for injuries inflicted by the negligence of a fellow servant. The Georgia law upon this subject was enacted in 1856 so far as it related to railroads. In 1862 Iowa abolished the fellow servant bar as to trainmen, and in 1874 Kansas did the same thing. In 1885 the state of Alabama adopted similar legislation, and in 1893 Arkansas qualified the doctrine as to railroad employment. Minnesota followed in 1887. Florida, Ohio, Mississippi, and Texas have modified the doctrine for the benefit of employés. North Carolina, North Dakota, Massachusetts, Wisconsin, and Minnesota denied its applicability to the operation of railroad trains, and in 1901 Colorado abolished the doctrine in toto. Nor have foreign governments been inattentive to this great and unreasonable injustice to that splendid body of citizenship upon whom so much of the prosperity of the nation must depend. In 1888 England denied its application to those engaged in the operation of railroad trains, and in 1897 made it also inapplicable

to many other hazardous employments. In Germany it does not apply to any of the hazardous occupations. In 1869 Austria passed a law making railroad companies liable for all injuries to their employés save where the injury was due to the victim's own negligence. The Code Napoleon made the employer answerable for all injuries received by his workman, and this is still of force in France, in Belgium, and in Holland. Other European countries have from time to time fixed the liability of the master to his servant for damages caused by the negligent act of a fellow servant. It is, however, unhappily true that many states of the Union, notwithstanding the anachronism of the rule, have maintained and still enforce it. But Congress has at length determined that there shall be an uniform law for the protection of that army of more than a million of men engaged in interstate traffic—an army whose courage, decision, patriotism, and intelligence may not be surpassed.

The rule which this legislation abrogates was based upon the contention that the servant contracts for a wage sufficient to protect him against risks incident to the service, that he is in a better position to observe and protect himself against the negligence of his fellow servant than his employer, and that it will insure better service and less injury if the master be not responsible. The briefest consideration will show how archaic is this reasoning when applied to modern conditions. Take the engineer on the locomotive which drives the lightning express. The complexity of his mighty machinery requires his constant and careful attention. Possibly in the darkness of night, 50 or 60 miles an hour his train thunders along the gleaming rails. His is blind obedience to his orders. Through the mistake or negligence of a fellow servant, over whose action he has no control, of whose mistake or misconduct he has no knowledge, in an instant he may be hurled to death, or to mutilation indescribable. While this is true, under the law which the act of Congress repeals, it has been held that the relation of fellow servant existed between an engineer acting as conductor and his fireman, between a common day laborer building a culvert and the engineer and conductor running a train, between an engineer operating one train and the conductor on another train on the same road, between conductor and brakeman on the same train, between the local telegraph operator and fireman upon the train, and in view of these relations, shadowy and intangible as they are, yet justified by the law as it existed, it has been held that the employer was not liable for the death and suffering which resulted. The law is a progressive science. The rule has long been deemed most unjustifiable. In Labatt on Master and Servant, vol. 2, § 754 it is declared:

"It does not rest upon any satisfactory bases, logical, social, or economic, and by relegating the injured person to his action against a co-employé, who is, as a general rule, financially irresponsible, leaves him in the great majority of instances, without any prospect whatever of obtaining the adequate indemnity."

Such conditions will no longer exist. Said the house committee in its report on this measure:

"Now where the doctrine of fellow servant is in force no one is responsible for the injury or death of the fellow servant. The co-servant who is guilty of negligence resulting in the injury may be liable, but as a rule he is not responsible. Employés are never held to such strict rules for the safety of his co-employés, because the employer is not bound to pay damages in case of injury. If he were held liable for damages for every injury occasioned by the negligence of his servants, he would enforce the same strict rules for the safety of his employés as he does for the safety of passengers and strangers, he will make the employment of his servant and his retention in the service dependent upon the exercise of higher care, and this will be a strong inducement to the employé to act with higher regard for the safety of his fellow workmen."

It is, however, urged that the states are adequate to afford all needed relief. It will suffice to reply that a majority of them have not done so. An employé of interstate traffic may receive measurable protection from the negligence of his fellow servant in Georgia, though even here his whole demand is denied if he is himself guilty of any negligence contributory to the injury, however slight. His train rolls across the boundary line of South Carolina or Tennessee, and there for the same negligence, the same injury, the same death, he or his wife and children may be denied any and all redress.

But it is additionally objected that he who is engaged in interstate traffic also handles traffic which is intrastate, and this should be held to vitiate the legislation of Congress. By a parity of reasoning this would annul the laws in interior waterway navigation already discussed; it would abolish the Interstate Commerce Commission, and all of those regulations which Congress has enacted for the transportation and business of interstate commerce. "It will not do," said the Supreme Court, in Wheeling Bridge Case, 18 How. 421, 15 L. Ed. 435, "to say that the exercise of an admitted power of Congress conferred by the Constitution is to be withheld, if it appears or can be shown that the effect and operation of the law may incidentally extend beyond the limitation of the power. Upon any such interpretation the principal object of the framers of the instrument in conferring the power would be sacrificed to the subordinate consequences resulting from its exercise." In The Katie (D. C.) 40 Fed. 492, 7 L. R. A. 55, it was held:

"The purpose of the Legislature being legitimate and warranted by the Constitution, it is wholly immaterial to the consideration of its validity that somewhere it has a casual or contingent effect upon the domain of state legislation."

Were this argument sound, the shipment of a crate of pigs from Macon to Griswoldville would annul the power of Congress to control the shipment by the same train of a thousand bales of cotton from Macon en route to Liverpool.

It is true that, in support of this contention that the act is an unwarrantable interference by Congress with the trade and traffic between citizens of the same state, two decisions of the Supreme Court are cited. These are the Trade-Mark Cases, 100 U. S. 82, 25 L. Ed. 550, and Illinois Central Railroad Company v. J. U. McKendree (decided December 17, 1906) 203 U. S. 514, 27 Sup. Ct. 153, 51 L. Ed. ——. They are readily distinguishable from the question here. In the former, said Mr. Justice Miller, stating the grounds upon which the Trade-Mark legislation was held unconstitutional (page 96 of 100 U. S. [25 L. Ed. 550]):

"When * * * Congress undertakes to enact a law, which can only be valid as a regulation of commerce, it is reasonable to expect to find on the face of the law, or from its essential nature, that it is a regulation of commerce with foreign nations, or among the several states, or with the Indian tribes. If not so limited, it is in excess of the power of Congress."

The acts there in question contained no reference whatever, either in terms or by implication, to interstate or foreign commerce, but applied to all trade-marks, by whomsoever and for whatever purpose used. And that this was the basis of the decision is clear from the court's reasoning:

"We would naturally look for this in the description of the class of persons who are entitled to register a trade-mark, or in reference to the goods to which it should be applied. If, for instance, the statute described persons engaged in commerce between the different states, and related to the use of trade-marks in such commerce, it would be evident that Congress believed that it was acting under the clause of the Constitution which authorizes it to regulate commerce among the states. * * * But no such idea is found or suggested in this statute."

The language quoted renders obvious the distinction between that case and the one under consideration. Here, "on the face of the law," there is a regulation of interstate traffic. The act relates to employés of common carriers, and "describes persons engaged in commerce between the different states." Besides, the Trade-Mark Cases dealt with indictments for alleged crime, and in criminal cases the laws are construed with the utmost strictness against the government. This is remedial legislation, and the opposite rule is adopted.

Nor is the case of Illinois Central Railroad Company v. McKendree, 27 Sup. Ct. 153, 51 L. Ed. ——, decisive of the question here in issue. In that case, the Secretary of Agriculture had adopted a certain quarantine line in the state of Tennessee, under act of Congress, "to more effectually suppress and prevent the spread of contagious and infectious diseases of live stock." This order was attacked because it applied to all cattle—to those transported within the state of Tennessee as well as without the state. It was not limited to cattle as a commodity of interstate commerce, and this therefore rendered it invalid. Mr. Justice Day declares:

"The order in terms applies alike to interstate and intrastate commerce. A party prosecuted for violating this order would be within its terms if the cattle were brought from the south of the line to a point north of the line within the state of Tennessee. * * * For aught that appears upon the face of the order the secretary intended it to apply to all commerce, and whether he would have made such an order, if strictly limited to interstate commerce, we have no means of knowing. The order is in terms single and indivisible."

In the case here the act is an express regulation of interstate commerce, limited to the employés of those common carriers who are engaged therein. It operates neither expressly nor impliedly upon employés or carriers in solely intrastate traffic. But even could it be so construed, certainly the power of Congress to control interstate instrumentalities would not be divested, merely because those instrumentalities may be incidentally used as mediums of local commerce. The Wheeling Bridge Case, supra.

Nor can it be justly contended that any injury will result to any corporation or person engaged in interstate or foreign commerce by the means of redress for injuries thus afforded by the act of Congress. There is no deprivation of due process of law. Mo. Pacific R. R. Co. v. Mackey, 127 U. S. 205, 8 Sup. Ct. 1161, 32 L. Ed. 107; McGuire v. Chicago, etc., R. R. (Iowa) 108 N. W. 902. It is true that an action like that under consideration presents a controversy arising under the Constitution and laws of the United States. It is also true that the judicial power of the United States extends to such controversy, and jurisdiction is therefore conferred upon the courts of the United States. The judges of those courts will scarcely entertain an argument that this will be injurious to either party litigant. The plaintiff, however, need not seek the court unless he chooses to do so. Its jurisdiction is not exclusive, but merely concurrent. He may sue for his federal cause of action, thus created, in the state court. On the other hand, many railroads and other corporations engaged in interstate commerce, already remove the actions or suits in which they are parties defendant from the state courts to the courts of the United States. It-is within the bounds of possibility that the controlling and influential owners of great railroads, which traverse those states where no redress at all is afforded to the employé for injuries consequent upon the negligence of a fellow servant, may regard this legislation as injurious.

Be this as it may, Congress has now drawn the whole subject within the boundaries of its constitutional power. It is seeking to protect the employés who are the instruments and agents of commerce. The government of the United States, within the scope of its powers, operates upon every foot of territory under its jurisdiction. It legislates for the whole nation, and is not embarrassed by state lines. Pensacola Telegraph Co. v. Western Union Telegraph Co., 96 U. S. 10, 24 L. Ed. 708. "It is a principle fully recognized by decisions of the state and federal courts that, wherever there is any business, from which, either from the products created or the instrumentalities used, there is danger to life or property, it is not only within the power of the states, but it is among their plain duties to make provisions against accidents likely to follow in such business, so that the dangers attending it may be guarded against so far as is practicable." This is the language of Mr. Justice Fields in Nashville, etc., Railway v. Alabama, 128 U. S. 99, 9 Sup. Ct. 28, 32 L. Ed. 352, who spoke for the unanimous court. This great Justice, however, in the same paragraph also says:

"It is conceded that the power of Congress to regulate interstate commerce is plenary; that, as incident to it, Congress may regulate as to the qualifications, duties, and liabilities of employés and others on railway trains engaged in that commerce; and that such legislation will supersede any state action upon the subject. But until such legislation is had, it is clearly within the competency of the states to provide against accidents on trains whilst within their limits."

On this subject it would seem that the argument is exhaustive. To the same effect are Smith v. Alabama, 124 U. S. 473, 8 Sup. Ct. 564, 31 L. Ed. 508; Sherlock v. Alling, 93 U. S. 99, 23 L. Ed. 819; New York, New Haven & Hartford R. R. v. New York, 165 U. S. 631.

17 Sup. Ct. 418, 41· L. Ed. 853; Cooley v. Board of Wardens, 12 How. 320, 13 L. Ed. 996.

The identical power of the legislative authority to pass a liability act abrogating the fellow servant rule and forbidding the making of contracts of exemption has been considered in the case of Peirce v. Van Dusen, 78 Fed. 694, 24 C. C. A. 280, 69 L. R. A. 705, by the Circuit Court of Appeals of the Sixth Circuit, before Associate Justice Harlan, and Circuit Judges William H. Taft and Horace H. Lurton. The case was decided in 1897, and the associate justice delivered the opinion for the unanimous court. The direct question in issue was the validity of an Ohio statute, but said the Circuit Court of Appeals:

"Undoubtedly, the whole subject of the liability of interstate railroad companies for the negligence of those in their service may be covered by national legislation enacted by Congress under its power to regulate commerce among the states."

It will be borne in mind that the national Legislature had not then regulated as to such negligence, and Mr. Justice Harlan continues:

"But, as Congress has not dealt with that subject, it was competent for Ohio to declare that an employé of any railroad corporation doing business there, including those engaged in commerce ·among the states, shall be deemed. in respect to acts within this state, the superior, not the fellow servant, of other employés placed under his control."

I may add that a strong analogy to the question under consideration is found in the legislation of Congress and the decisions of the national courts requiring safety appliances on all trains engaged in interstate commerce.·. In Johnson v. Southern Pacific Company, 196 U. S. 16, 25 Sup. Ct. 158, 49 L. Ed. 363, the Supreme Court applied and construed the act of March 2, 1893. This required the equipment of locomotives, trains, and cars with air brakes, automatic couplers, etc. Said Chief Justice Fuller (page 17 of 196 ·U. S., page 161 of 25 Sup. Ct. [49 L. Ed. 363]):

"The primary object of the act was to promote the public welfare by securing the safety of employés and travelers."

It is obvious that passengers transported or employés working between intrastate points would enjoy the protection of this exercise by Congress of its power to regulate. The court thus recognized the right of Congress to legislate for the protection of employés and of the general public, and decided that a dining car in making an interstate journey was equally under the control of Congress 'while waiting to be made up into a train as while in motion. While the original safety appliance act made it unlawful for common carriers, engaged in interstate commerce, to haul cars not properly equipped when "used in moving interstate traffic," the amendatory act of 1903 declared that the original provisions should be held to apply to "all trains, locomotives, tenders, cars, and similar vehicles used on any railroad engaged in interstate commerce." Obviously, this was an explicit recognition by Congress of its constitutional right to control the instrumentalities, ·and prescribe conditions for all interstate common carriers. This, is also the construction given in the recent case of United States v. Great Northern Railway Co. (D. C.) 145 Fed. 438,

where the court held that the amended act applied to all cars regularly used on any railroad engaged in interstate commerce, not only while actually in use in such commerce, but at all times when in use on such road. The language used by the court is as follows:

"It is manifest that the purpose in view was the regulation of commerce between the states by requiring common carriers to conform to certain requirements regarded as essential to the safety of employés and passengers. To sustain the demurrer would be to hold that it is beyond the power of Congress to control the instrumentalities through which interstate commerce may be carried on. * * * It is the carrier which the acts seek to regulate, and it is by this method that Congress has undertaken to bring the matter under control."

While I am aware that no determination of this great question will be generally satisfactory save that of the Supreme Court, I have not felt at liberty to await the decision of that great tribunal, and thus avoid the responsibility of making my own determination of the pending case. I am clear as to the constitutionality of this measure; but if I were in doubt, I would uphold the law. It is a part of that splendid practical philosophy of government which is intended for the betterment of mankind. The statesmen who dealt with this question did not deal with abstractions. They were not enchanted with those flowers and blossoms which are sometimes woven into garlands to crown that divinity—the sovereign state. Like Lord Bacon in the Novum Organum and other works written to ameliorate the hardships of life, they were after "fruit." It is pardonable perhaps to declare that no court has gone farther than this in the maintenance of those "state rights" which are practical and valuable. The laws of the state against the sale of intoxicating liquors within three miles of a country church or school house, to authorize municipal corporations to forbid the sale, forbidding marriage between persons of the negro and white races, the homestead and exemption laws, the laws forbidding the consolidation of competing lines of railway, in violation of the state Constitution and in violation of the national law against "combinations in restraint of trade," and other state laws, have been steadily and sincerely upheld. Here, however, no right proper to the state, or any of its instrumentalities of government, is drawn in question. Disquisitions upon profitless, inutile, or imaginary "reserved rights" have never been charming to the writer. Such structures of ratiocination— and I again borrow from Bacon—are "like the ox of Prometheus, a sleek, well-shaped hide, stuffed with rubbish, goodly to look at, but containing nothing to eat."

The law itself deserves the approbation of the entire country. Its incentive to carefulness on the part of those who control railways will be immeasurable. It will bring to many an honest, fearless heart, the consciousness that he and his loved ones are insured against the folly and negligence of his fellows, whom he cannot control. Had it been of force in the past, thousands of our countrymen who are sleeping in untimely and tragic graves might now be leading useful lives, and many additional thousands who now spend the interval of life which remains to them in the mortification of mutilation, and in its incurable suffering, might now be happy and well. Surely, at

151 F.—40

a period when every day brings its story of crashing and murderous collisions, of derailed and shattered trains, the long catalogue of the slain, the mangled, and dismembered, such efforts on the part of government to extend its protecting care around its people employed in its mightiest interest should not be lightly discredited. The philanthropy and statesmanship which prompted it are not undeserving of such a eulogium as that pronounced by Macaulay on the philosophy of Bacon:

"It has lengthened life. It has mitigated pain. It has extinguished diseases. It has increased the fertility of the soil. It has given new securities to the mariner. It has furnished new arms to the warrior. It has spanned great rivers and estuaries with bridges of form unknown to our fathers. It has guided the thunderbolt innocuously from heaven to earth. It has lighted up the night with the splendor of the day. It has extended the range of the human vision. It has multiplied the power of the human muscles. It has accelerated motion. It has annihilated distance. It has facilitated intercourse, correspondence, all friendly offices, all dispatch of business. It has enabled man to descend to the depths of the sea, to soar into the air, to penetrate securely into the noxious recesses of the earth. * * * These are but a part of its fruits, and of its first fruits. For it is a philosophy which never rests, which has never attained, which is never perfect. Its law is progress. The point, which yesterday was invisible, is its goal today, and will be its starting post tomorrow."

The demurrer on all grounds is overruled.