CASE 3.—PROSECUTION BY INDICTMENT AGAINST THE UNITED STATES FIDELITY & GUARANTY COM-PANY FOR FAILING TO PAY A LICENSE TAX.—June 9, 1910.

# U. S. Fidelity & Guaranty Co. v. Commonwealth.

Appeal from Mason Circuit Court.

C. D. NEWELL, Circuit Judge.

Defendant convicted and appeals.—Affirmed.

1. Commerce— "Interstate Commerce"—Elements.—"Interstate commerce" within the exclusive jurisdiction of Congress, in-volves, as an essential and indispensable element, the trans-portation of property or intelligence from one state to an-other, embracing not only the property or intelligence so sent, but the physical agencies, as the railroad, express and telegraph companies engaged in the commerce, and their employes, as well as all persons who are directly connected as principals or agents in carrying on the business except that as applied to intelligence it does not includes all persons who write letters, but is confined to those persons, such as the postal authorities and employes of telegraph companies, through whose agency or instrumentality the intelligence de-sired to be sent is conveyed, and those who send or ex-change intelligence as an essential part of their business and that directly results in the transportation of property.

2. Commerce—Interstate Commerce—Reporting Credits.—De-fendant, a foreign corporation, operated a scheme to obtain commercial credits by publishing a list of attorneys through-out the United States, to promptly remit all moneys collected, and placed in the hands of subscribing business concerns throughout the United States. The attorneys paid defendant for advertisement or representation in the list, and also agreed to furnish defendant's business customers gratis credit reports direct concerning business houses in the vi-cinity of the attorney's residence with whom the business subscribers were contemplating contracts. These reports were sent through the mail irregularly and had no direct re-

lation to the sale of goods to be transported in interstate commerce. Held, that the furnishing of such reports by defendant through its attorneys was not "interstate commerce," so as to relieve defendant from liability for a license tax under Ky. St. section 4224, providing that each corporation and its representatives in the state, engaging in reporting credits, shall pay a license tax of $100.

ALLAN D. COLE for appellant.

JAS. BREATHITT attorney general and TOM B. McGREGOR assistant attorney general for Commonwealth.

OPINION OF THE COURT BY JUDGE CARROLL—Affirming.

The question in this case is: Was the appellant company at the time of its indictment and conviction engaged in the business of interstate commerce and consequently exempt from the operations of section 4224 of the Kentucky Statutes, providing in part that "each and every person, partnership or corporation having representatives in this state, who engage in the business of inquiring into and reporting upon the credit and standing of persons engaged in business in this state, shall pay a license tax of one hundred dollars?" The appellant company was indicted for failing to pay the license tax demanded by the statute, and upon a trial under the indictment was fined $150. Heretofore, the commonwealth proceeded by penal action against the appellant company to recover the penalty denounced for failure to comply with the provisions of the statute in reference to paying a license tax, and from a judgment finding it guilty it prosecuted an appeal to this court. In the opinion, which may be found in 118 S. W. 1,000, 133 Ky. 740, we held that the company was engaged in the business of inquir-

ing into and reporting upon the credit and standing of persons engaged in business in this state, and hence liable for the tax. In that case the only defense made was that the business it was engaged in did not fall within the scope or meaning of the statute. Upon that feature of the case we are satisfied with the correctness of the conclusion reached in the former case. So that the only question now open is: Was the business the company engaged in "interstate commerce" within the meaning of section 8 of the federal Constitution, providing that "the Congress shall have power  * * *  to regulate commerce with foreign nations, and among the several states, and with the Indian tribes?"

For the purpose of clearly presenting the question, we will state so much of the indictment, special plea, and evidence as may be necessary to an understanding of it. The indictment charges that the company "did unlawfully, willfully, and knowingly employ and keep representatives and agents, to-wit, A. D. Cole and F. P. O'Donnell, in said county and state of Kentucky, engaged and employed in the business of inquiring into and reporting upon the credit and standing of persons engaged in business in said Mason county, Ky.; and that said representatives and agents, as representatives and agents of said United States Fidelity & Guaranty Company, during all times mentioned herein, inquired into and reported upon the credit and standing of divers persons, whose names are unknown to the grand jury, engaged in business in said county and state, during said time, and all of which was so done by said corporation and said A. D. Cole and F. P. O'Donnell, who were at all times aforesaid the authorized, engaged, and employed rep-

resentatives, agents, and correspondents of the said
corporation and engaged and employed as such by
said corporation, in carrying on said business of in-
quiring into and reporting upon the credit and stand-
ing of persons engaged in business in said county and
state, and all of which said inquiring and reporting
aforesaid was done by   said   representatives   and
agents of said corporation, with its knowledge, direc-
tion, and consent, and all of which was so done as
aforesaid by the said United States Fidelity & Guar-
anty Company and the said A. D. Cole and F. P.
O'Donnell without license so to do, contrary to law
and against the peace and dignity of   the   common-
wealth of Kentucky."

To this indictment the company, in addition to its
general plea of not guilty, interposed the following
special plea:   "It states that it is a corporation cre-
ated, organized, and existing under and by virtue of
the laws of the state of Maryland; that at all times
herein mentioned it has been engaged, pursuant to
its charter, in the publication and distribution of a
list of selected attorneys in the United States which
it has for a consideration furnished to business men
and merchants throughout the United States to enable
them to transact and carry on business between the
states of this Union; that, under its method of busi-
ness, its designated attorneys at Maysville, Ky., have
through the United States mail   received inquiries
from and made report to merchants residing outside
of this Commonwealth with reference  to the finan-
cial standing of merchants residing in  the  city
of Maysville and Mason county, as well as Aber-
deen, Brown county, Ohio; that the inquiries so re-
ceived and so furnished to said merchants and bus-
iness men outside the state of Kentucky have been

used by them as an incident to the carrying on of their said business and commerce between the states of this Union; that the purpose of the organization of defendant company and the granting of the rights and privileges to it as aforesaid was to enable it to be, and said defendant is now, and was at all times herein mentioned, in fact, an instrument to promote, facilitate, and carry on commerce between the states of the Union; and that the offense for which it has been indicted herein are and were matters and things done by it and its said agents under and pursuant to its said charter in promoting and facilitating commerce between the states of the Union. Defendant therefore states that the act of the Legislature of Kentucky pursuant to which the indictment herein was drawn is and was in conflict with section 8, subsection 3, of the Constitution of the United States, which it now pleads and relies upon in bar of this indictment, and that the provisions of said act are therefore null and void as to this defendant."

Frank P. O'Donnell, the agent of the company at Maysville, testified, in part: "Q. State the substance of the contract you had with them in regard to the reporting upon the credit and standing of persons engaged in business in Maysville, Mason county, Ky. A. My recollection is that I assumed the obligation to diligently and faithfully and truthfully report on persons, their credit and character for reliability, etc., which might be sought by merchants elsewhere or in the state." He further said that it was his duty under the agreement with the company "to make prompt reports free of charge to said subscriber, but only when request for same is accompanied by the department's usual form of inquiry blank, upon persons engaged in any branch of trade in the city or

town and vicinity where the undersigned is located. Such reports to be as full and comprehensive as can be made upon a reasonable investigation of the person or persons inquired about. Under no circumstances will the undersigned reveal the name or address of the inquirer to the person or persons upon whom the inquiry is made. Q. During those 12 months prior to March 30th, did you, or not, in pursuance of that agreement and as agent and representative and correspondent of the United States Fidelity & Guaranty Company, make report on the credit and standing of divers persons engaged in business in the county of Mason, this state? A. I did. Q. You are located in Mason county and were the agent for Mason county, Ky.? A. Mr. Cole and myself were the agents for Mason county in that department; yes, sir. Q. What was there in regard to an agreement for you to pay the company anything? A. There was a consideration paid for representation. Q. And for that consideration paid you had your name inserted? A. That was not the inducement with me, at least; the inducement was to get the business. Q. Of being their attorney? A. Yes, sir Q. And for that consideration paid to them you had your name inserted in the Quarterly? A. I don't know whether it was in consideration of that fact, but the fact is it was inserted. Q. Did you, or not, make those credit reports directly to the guaranty company, and by subscribers sending you in blanks saying they were subscribers of the company and entitled to such reports? A. All of our business was done directly with the subscribers who were generally merchants who sought to know the standing of local merchants. Q. From whom did you receive communications with reference to the financial standing of

merchants in Mason county and adjacent territory? A. From divers persons. I could not now, I believe, recall a single person, and under my contract I would not be permitted to reveal the person by whom information was sought."

In brief, the agreement or arrangement between the appellant company and its attorney was that the appellant company, in consideration of the fee paid to it by attorneys throughout the country, inserted their names in books issued by it, and guaranteed merchants and other persons sending to these attorneys claims that they would promptly and faithfully pay over all money collected. It also furnished merchants and other persons for a consideration its list of guaranteed attorneys, and provided the attorneys and subscribers with blank forms upon which information respecting the financial standing of persons whom the subscribing merchant desired to deal with might be furnished by the attorney. The attorneys, when requested, answered such inquiries concerning the business and commercial standing of persons as subscribing members to the list of guaranteed attorneys desired. These attorneys did not make any reports to the guaranty company, but sent their reports direct to the firm or person making the inquiry.

We will now proceed to inquire whether or not the appellant company, through the agency of these Maysville attorneys, was engaged in this state in "interstate commerce." If it was, the judgment must be reversed, with directions to dismiss the prosecution, as there is, of course, no room to doubt that the state cannot levy a tax upon persons or things engaged in carrying on interstate commerce. In the consideration of this question, which involves an attempt

to make what seems to us a new application of the commerce clause of the Constitution, we will confine ourselves in the citation of authority to the opinions of the Supreme Court of the United States, as the final construction and application of this clause of the Constitution is entirely the result of the opinions of that court. In the multitude of cases on this subject decided by the Supreme Court, beginning in 1824 with Gibbons v. Ogden, 9 Wheat. 1, 6 L. Ed. 23, and ending with the International Text-Book Company v. Pigg (handed down April 4, 1910), 217 U. S. 91, 30 Sup. Ct. 481, 54 L. Ed. —, we have not found any case that extends as far the law applicable to interstate commerce as we are asked to go in this case.

As we understand "interstate commerce," excluding its application to persons as not pertinent to the matter under consideration, the essential and indispensable element in it is the transportation of property or intelligence from one state into another. It embraces not only the property or intelligence thus sent, but the physical agencies, such as railroad, express and telegraph companies engaged in the commerce, and their employes, as well as all persons who are directly connected as principals or agents in carrying on the business, except that as applied to intelligence it does not include every person who writes a letter or sends a message, being confined to those persons, such as the postal authorities and employes of telegraph companies, through whose agency or instrumentality the intelligence desired to be sent is conveyed, and those persons who send or exchange intelligence as an essential part of a business they are engaged in and that directly results in the transportation of property. And it is not competent for the state to place any burden or restraint in the way of

taxation or otherwise upon any of the articles or things that are the subject of interstate commerce, or upon any agency or instrumentality that assists, directly or immediately in carrying it on. In other words, interstate commerce, until it has acquired a situs or place of abode within the jurisdiction of a state, has the unrestricted privilege of coming and going where it pleases. The Constitution of the United States has extended to it the freedom of each state, and no state has the right to abridge in any way its freedom, or to impose upon it any burden or restraint, although the property used in carrying it on may be taxed in the state where it is located. With this general statement, we will confine the scope of this opinion to the precise matter in hand, which is limited to the single inquiry whether or not the appellant company, in the promotion of its business through these attorneys, is an agency or instrumentality of interstate commerce. If it is, then it is necessarily due to the fact that its attorneys in gathering and forwarding information are directly or immediately connected with the transportation of property from one state into another.

The opinions of the Supreme Court have never extended the application of the commerce clause to persons who had no direct relation to the business carried on; but, when they have sustained such relation, it has been uniformly held that it was not competent for the state to impose on them any tax. Thus, it was held in Crutcher v. Commonwealth of Kentucky, 141 U. S. 47, 11 Sup. Ct. 851, 35 L. Ed. 649, that it was not within the power of the state to require the agent of an express company doing interstate business to obtain a license from the Auditor of the state; the court saying: "We have repeatedly

decided that a state law-is unconstitutional and void which requires a party to take out a license for carrying on interstate commerce, no matter how specious the pretext may be for imposing it. * * * No state has the right to lay a tax on interstate commerce in any form, whether by way of duties laid on the transportation of the subjects of that commerce, or on the receipts derived from that transportation, or on the occupation or business of carrying it on, for the reason that taxation is a burden on that commerce and amounts to a regulation of it, which belongs solely to Congress.''

And in McCall v. People of State of California, 136 U. S. 104, 10 Sup. Ct. 881, 34 L. Ed. 391, an ordinance was held invalid that imposed a license tax upon the agent of a railroad, whose duty it was to solicit passenger traffic over a road engaged in interstate commerce. In that case the court said: ''The fact of intercourse and traffic embraces all the means, instrumentalities, and places by and in which intercourse and traffic are carried on; and, further still, comprehends the act of carrying them on at these places and by and with these means. The subject-matter of intercourse or traffic may be either things, goods, chattels, merchandise, or persons. All these may therefore be regulated.''

And so in Robbins v. Taxing District of Shelby County, 120 U. S. 489, 7 Sup. Ct. 592, 30 L. Ed. 694, a statute of the state of Tennessee imposing upon ''all drummers and all persons, not having a regular licensed house of business in the taxing district, offering for sale or selling goods, wares or merchandise therein, by sample,'' a license tax was held invalid in so far as it applied to drummers representing non-resident firms. In that case the court said: ''A state

cannot impose taxes upon  persons passing through
the state or coming into it merely for a temporary
purpose, especially  if connected with interstate or
foreign commerce.  * * *  When  goods are  sent
from one state to another for sale, or, in consequence
of a sale, they become a part of its general property
and amenable to its laws, provided that no discrimina-
tion be made against them as goods from another
state, and that they be not taxed by reason of being
brought from another state, but only taxed in the
usual way as other goods are.  But to tax the sale of
such goods or the offer to sell them before they are
brought into the state is a very different thing and
seems to us clearly a tax on interstate commerce it-
self."

Again, in Caldwell v. State of North Carolina, 187
U. S. 622, 23 Sup. Ct. 229, 47 L. Ed. 336, an ordinance
requiring the agent of a nonresident company to ob-
tain a license before he delivered the goods previous-
ly sold by the company was held to be in violation of
the commerce clause of the Constitution.

In Stockard v. Morgan, 185 U. S. 27, 22 Sup. Ct.
576, 46 L. Ed. 785, a statute of Tennessee imposing a
tax upon merchandise  brokers whose  business was
confined  to soliciting  orders within  the  state, as
agents for nonresident factories, was declared to be
in violation of the  commerce clause of the federal
Constitution.

In International Text-Book Company v. Pigg, su-
pra, the facts were these: The text-book company
was a Pennsylvania corporation, carrying on what
was known as  a "correspondence school."  In the
conduct of its business, "it prepared and published
instruction papers, text-books, and illustrative appa-
ratus for courses of study to be pursued by means of

correspondence, and the forwarding from time to time of such publications and apparatus to students. The company employs local or traveling agents, called 'solicitors,' 'collectors,' whose duties are to procure and forward to the company at Scranton from persons in a specified territory, on blanks furnished by it, applications for scholarships in its correspondence schools. * * * In conformity with the contract between the company and its scholars, the scholarship and instruction papers, text-books, and illustrative apparatus called for under each accepted application are sent by the company from Scranton directly to the applicant, and instruction is imparted by means of correspondence through the mails between the company at its office in that city and the applicant at his residence in another state.'' The company had a solicitor in Kansas, who had procured a number of students to take correspondence courses in the schools of the text-book company. The question was whether or not the business in which the company was engaged was interstate commerce. In holding that it was, the court, among other things, said: "It involved, as already suggested, regular and practically continuous intercourse between the text-book company located in Pennsylvania and its scholars and agents in Kansas and other states. That intercourse was conducted by means of correspondence through the mails with such agents and scholars. * * * More than that, this mode—looking at the contract between the text-book company and its scholars—involved the transportation from the state where the school was located, to the state in which the scholar resided, of books, apparatus, and papers useful or necessary in the particular course of study the scholar is pursuing and in respect of which

he is entitled from time to time by virtue of his contract to information and direction. Intercourse of that kind between parties in different states—particularly when it is in the execution of a valid contract between them—is as much intercourse in the constitutional sense as intercourse by means of the telegraph. * * * If intercourse between persons of different states by means of telegraphic messages conveying intelligence or information is commerce among the states which no state may directly burden or unnecessarily incumber, we cannot doubt that intercourse or communication between persons in different states by means of correspondence through the mails is commerce among the states within the meaning of the Constitution, especially where, as here, such intercourse and communication really relate to matters of regular continuous business, and to the making of contracts and the transportation of books, papers, etc., appertaining to such business."

These cases we think sustain the general statement heretofore made, indicating the persons and things embraced within the meaning of the commerce clause. Now, let us see if the appellant company through its Maysville attorneys was so connected with the carrying on of commerce as to bring its acts within the protection of the Federal Constitution. That indirectly, remotely, or incidentally the attorneys may have had some minor part in the importation of goods may be conceded; but this is not sufficient. They must have had some immediate or direct connection with the transportation of goods from one state to another. The attorneys making the reports were not the agents for either the buyer or seller in the sense that goods or articles were bought or sold through their agency or instrumentality. The reports they furnished did

not constitute any contract of bargain or sale, or, indeed, offer to make any such contract. They merely reported the financial standing of merchants concerning whom inquiries were made, and this ended their connection with the matter. The merchant to whom the report was made might or might not in the exercise of his pleasure sell goods to the person whose standing he ascertained. If a commercial transaction took place between the merchant whose standing was reported and the merchant to whom the report was sent, it was due entirely to subsequent negotiations between them, with which the reporting attorneys had nothing to do. It will thus be seen that these attorneys had no direct relation to or with anything that was the subject of commerce. They did not sell or offer to sell any goods, they did not deliver or offer to deliver any, they did not handle or in any way have the possession of any goods, they did not bring the buyer and the seller together, or have anything whatever to do with the transportation of articles or goods, and we are unable to perceive how it can be said, under the broadest construction of the commerce clause, that the reports furnished by these attorneys were instrumentalities in facilitating or carrying on interstate commerce. As said in Adair v. United States, 208 U. S. 161, 28 Sup. Ct. 277, 52 L. Ed. 436: "Manifestly, any rule prescribed for the conduct of interstate commerce, in order to be within the competency of Congress under its power to regulate commerce among the states, must have some real or substantial relation to or connection with the commerce regulated." To the same effect is Hopkins v. United States, 171 U. S. 578, 19 Sup. Ct. 40, 43 L. Ed. 290.

Illustrating the business of the appellant by that carried on through its Kentucky attorneys, we find that the correspondence in which the Maysville attorneys furnished non-resident dealers with information was only desultory and occasional. It is doubtful if more than one letter was exchanged between these attorneys and their nonresident correspondent. The correspondence was not regular or continuous with any particular person, as in the International Text-Book Company Case; nor was it followed, as was the correspondence in that case, by the making of any contract or the transportation of any goods between the parties to the correspondence. If the interstate commerce clause is extended to embrace the facts of this case, and is held to be applicable to persons who are engaged in transmitting the character of information or intelligence imparted by the Maysville attorneys, there is virtually no limitation upon its reach, and there are few professional or business men of the state who cannot invoke its protection to save them from license taxes either imposed by the state or municipal governments. To illustrate, there are many physicians, lawyers, brokers, stock dealers, and real estate agents who occasionally carry on in a professional way correspondence with nonresident patients, clients, or patrons, and as a result of this correspondence it might happen that an engagement would be entered into that would result in the transportation of property or the making of contracts. But we can hardly believe that, merely because a person in one state occasionally writes a letter to a person in another state that may result in bringing about a contract between the parties or the exchange of commodities, he can be said to be engaged in interstate commerce in the sense that he

would be exempt from license taxes imposed upon every person engaged in a similar trade or occupation. Our Constitution authorizes the state and each of the towns and cities to impose a license tax on all trades and occupations, and under this power the state in many instances, and nearly all of the towns and cities, have imposed a license tax on lawyers, physicians, real estate agents, and many other trades and occupations. Now, is it to be said that a physician who can show that he is treating by correspondence a patient in Indiana, although he does not send him any medicine, is to be exempt from the license tax exacted from all other physicians in the state whose business is confined to the limits of the state? Is a lawyer practicing in this state, but who occasionally has litigation or business in another state that requires correspondence between himself and his clients and other parties, to be free from the burden that is imposed on other lawyers who practice exclusively in the courts of this state? Illustrations like these might be multiplied beyond number; but the ones we have mentioned are sufficient to make it manifest that, if the commerce clause is extended to reach this class of persons, it will be a serious obstacle in the way of the state and its municipal subdivisions in the collection of revenue, and result in the imposition of many unequal burdens in the way of taxation.

For the reasons indicated, the appellant, not being protected by the commerce clause of the Federal Constitution, must pay the tax imposed, and the judgment is affirmed.

BARKER, C. J., dissenting.