## UNITED STATES v. LIVE POULTRY DEALERS' PROTECTIVE ASS'N, Inc., et al.

(District Court, S. D. New York. April 7, 1924.)

1. **Commerce ☞40(1)—Buying in New York market of poultry from agents of interstate shippers held "interstate commerce."**

The buying of live poultry in the New York market by wholesale dealers from commission men, who received and sold it as agents for the shippers from various other states, *held* to constitute "interstate commerce," and the transactions *held* subject to the provisions of the Anti-Trust Act (Const. St. § 8820 et seq.).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Interstate Commerce.]

2. **Monopolies ☞17(3)—Poultry Association held a "combination in restraint of interstate commerce."**

An association which included the greater number of wholesale dealers in poultry in New York City, through a price committee, daily fixed the price to be paid for live poultry to the commission men, who received and sold the same as agents of the shippers, the shipments being largely interstate, and the price so fixed made the New York market quotation for that day, which had an influence on other markets. The association also undertook to boycott commission men who did not sell at the price fixed, or who sold to members who did not conform to the rules of the association as to resale prices, or to other wholesalers of whom the association did not approve. *Held*, that such acts were direct restrictions on competition in interstate commerce and the association a "combination in restraint of interstate commerce," in violation of Sherman Anti-Trust Act, § 1 (Comp. St. § 8820).

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Combination in Restraint of Trade.]

In Equity. Suit by the United States against the Live Poultry Dealers' Protective Association, Inc., and others. On motion by complainant for preliminary injunction. Granted.

William Hayward, U. S. Atty., of New York City (David A. L'Esperance, Jr., Sp. Asst. Atty. Gen., Rush H. Williamson, of New York City, and Ryland W. Joyce, of Washington, D. C., Sp. Asst. U. S. Attys., of counsel), for the United States.

Koenig, Sittenfeld & Aranow and Goldstein & Goldstein, all of New York City, for defendants.

WINSLOW, District Judge. This proceeding is a petition in equity filed by the United States, under the provisions of the Sherman Anti-Trust Act (Comp. St. § 8820 et seq.), against the Live Poultry Dealers' Protective Association, Inc., and upwards of 22 of its officers and members, individually and in their official capacities and as representatives of all other members of the association, for the purpose of terminating certain illegal restraints alleged to exist in the purchase and sale of live poultry in the markets of New York City. The prayer of the petition, among other things, asks that the association be dissolved, and that its members be enjoined from continuing or entering into any other like association for similar purposes, and that such injunction be enforced collectively and individually, restraining them from fixing or

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

establishing uniform prices to be paid by them in the purchase of such poultry from shippers, and likewise that they be enjoined from boycotting receivers of such poultry acting as agents for the shippers, and from discriminating against other buyers or wholesalers or receivers or commission men in conformity with any rule or regulation or policy heretofore adopted by the said association. The motion herein is made by the petitioner for an injunction pendente lite, praying the court that all operations of the association relating to the fixing of prices or boycotting or discriminating be enjoined, and that the members, individually and as an association, be enjoined from engaging in such practices as affecting the alleged interstate commerce.

It appears that live poultry of the value of upwards of $30,000,000 per annum, purchased and raised principally in the Middle Western States and also in certain of the Southwestern and Middle Atlantic States, is purchased in those states by a large number of concerns specializing in such business, who, in turn, ship it by common carrier to West Washington Market, in the borough of Manhattan, New York City; that other territory adjacent thereto, namely, the cities of Hoboken and Jersey City, in the state of New Jersey, are also markets for the same, and that at those points large quantities of this live poultry are offered for sale and sold on behalf of the various shippers of the same by a group of concerns known as receivers or commission men, acting as agents for the shippers. These receivers as aforesaid, as agents for the shippers from the states above referred to, offer for sale and sell this poultry to a large number of concerns, said to be about 300, known as buyers or wholesalers, located in or about New York City. Some deliveries of this poultry are made to buyers in Jersey City and Hoboken, in the state of New Jersey, and the balance is delivered at West Washington Market, in New York City, as above stated. This live poultry, so acquired by the buyers, is slaughtered in the greater part in what is known as the Kosher form, and then resold in the city of New York directly to retailers and consumers. Such retailers sell such poultry, thus slaughtered, to consumers, also located principally in New York City.

In or about February, 1914, the principal buyers engaged in the purchase and resale of poultry organized under the Membership Corporation Law of the state of New York (Consol. Laws, c. 35), an Association known as the Live Poultry Dealers' Protective Association, Inc. A large proportion of the buyers in New York City are included in its membership. It appears from the record that the control of this association and its operation are under the direction of its officers and an executive committee. The minutes disclose the election of officers and an executive committee, and also that this executive committee appointed a price committee of seven members, "to make up a committee which is fully authorized to bid on the price of poultry in order to obtain the market price therefor." The officers and this executive committee so elected and the members of the price committee are parties defendant in this proceeding. It also appears that on or about June 1, 1923, the defendant association, through its officers, issued a circular letter to substantially all the receivers or commission men

handling poultry in New York City as agents for shippers in other states, notifying them that the association had appointed a price committee, consisting of seven members, who were fully authorized on behalf of the association to bid on the live poultry, to which reference is made for the purpose of establishing a market quotation, and that the concurrent agreement of four members of this committee was necessary to any price so established.

The actual operation of this price committee, it appears, was substantially as follows: On business days, either individually or collectively, they went to West Washington Market, New York City, where the available supplies of poultry, either on hand or moving, were ascertained, and, after talking with individual receivers or prospective receivers of such poultry, this price committee agreed upon, fixed, and announced a price which would be paid by all the members of this association for poultry purchased from such receivers. The record further shows that in the great majority of cases the price thus fixed and announced dominated and controlled the New York market, and fixed the price which was actually received by substantially all shippers for their poultry so shipped and sold to buyers or wholesalers, as described herein, for use and resale in New York City. It does not appear to be disputed that the members of the association were bound in their dealings with receivers by the prices fixed as stated, and also that the control of the market by this price committee was so complete that rarely did individual members offer contrary opinions as to what the market should be. In other words, the price committee exercised a power delegated by the members of the association to them, which was binding upon the entire membership as to price in its dealings with receivers for the purchase of this live poultry. It is also apparent that the publication of the price in the New York wholesale market substantially affected the price paid in other large markets throughout the whole trade, both here and elsewhere.

The methods referred to in effect eliminated competition to a great extent between individual buyers and individual receivers, and deprived the shippers of such poultry in interstate trade and commerce of the open market in a sale of their line of poultry by free competition. It also further appears that the association and its members from time to time have threatened boycotts against certain receivers of live poultry, evidently for the purpose of compelling such receivers not to sell and deliver poultry to other buyers and wholesalers, of whom the defendant association or its members did not approve, and also for the purpose of preventing them from securing supplies of live poultry to be resold on the markets of New York City. It is alleged that on numerous occasions the boycott was successful in preventing buyers or wholesalers from securing supplies from the receivers.

It would appear, therefore, that competition is eliminated in the purchase of such live poultry from the shippers, and it further appears that the effect of this combination, if not the avowed purpose, is likewise to destroy free competition in the sale of live poultry by buyers or wholesalers to their customers. A great number of persons are affected by the methods referred to, beginning with the farmer who raises the

poultry in the states distant from New York City, the shipper who purchases it from the farmer, the receiver who acts as the agent for such shipper, the independent buyer or wholesaler, the retailer, and the ultimate consumer. On the foregoing state of facts, the petitioner, the United States, argues for an injunction pendente lite.

[1] The defendant contends that it does not appear from the record that the defendant organization and the individual members thereof are engaged in interstate commerce, and therefore that this court is without jurisdiction to grant the relief prayed for. It is further contended that, in any event, the acts complained of are not in violation of the statute and are reasonable, and that at most the acts complained of are indirect and merely incidental. It is manifest that, if the character of the business in which the defendants are engaged is not interstate commerce and their acts do not affect interstate commerce, then this court cannot act. Is it interstate commerce in which the defendants are engaged, or is it a business which is merely an aid or facility to commerce, and if it affects interstate commerce at all, does it so affect it only in an indirect and incidental manner?

In U. S. v. Swift & Co. (C. C.) 122 Fed. 529, 533, and Swift & Co. v. U. S., 196 U. S. 375, 399, 25 Sup. Ct. 276, 49 L. Ed. 518, it appeared that cattle were shipped from outside Illinois to the stockyards at Chicago, for sale by agents of the shippers; that a number of purchasers of such cattle, the beef companies, were charged with having their purchasing agents act in concert as to prices paid for such cattle. The lower court said, regarding those transactions:

"It reaches backward to the purchase of cattle that come to defendants from states other than those in which defendants manufacture, and it reaches forward to the sale of the meats, after conversion, to parties dealing with respect thereto from states other than the state of the defendants, followed by shipments into the other states. Each of these transactions constitute, in my judgment, interstate commerce. The purchase of cattle shipped habitually from other states to the markets where defendants purchase, in the expectation that the purchase will be made by the slaughter companies, is an act of interstate commerce. Hopkins' Case, 171 U. S. 590, 19 Sup. Ct. 40, 43 L. Ed. 290.

"It is none the less interstate commerce merely because the local incidents or facilities for such purchase are to be regarded as outside the interstate character of the transaction. Thus the local commission broker, or the men who drive the cattle from the pens to the slaughter house, need not, in any survey of the transaction, be held to be within the interstate status of the transaction. With them, it is essentially the same whether the cattle come from the state in which the purchase is made, or from other states. They are aids or facilities only, and as such are merely local incidents. But the purchase of livestock thus brought habitually from other states, relates, in its larger bearings, to a transaction that had its beginning in other states. The original shipments are influenced, and to a large extent brought about, by the character of the purchase."

In this connection, the Supreme Court indicated that the injunction would lie with reference to the purchase of live stock, "which stock is sent from other states to the stockyards for sale, or is bought at these yards for transport to another state." And again, in the same case (122 Fed. 533), the court said:

"I think the same is true of meat sent to agents, and sold from their stores. The transaction in such case, in reality, is between the purchaser and the

agents' principal. The agents represent the principal at the place where the exchange takes place; but the transaction, as a commercial entity, includes the principal, and includes him as dealing from his place of business."

In the case at bar, the poultry is sent by the shippers from the various states to the commission men, who are described as "receivers" acting as shippers' agents, and sold by these agents to the defendants, who, in turn, dispose of it to the wholesalers and retailers, and, after slaughter, the poultry reaches the ultimate consumer. The prices paid by the defendants to the receivers, who are the agents of the shippers, are fixed by the price committee. So it would appear that the sales are by persons in one state to persons in another. These sales to the defendants are a part of the interstate transaction, for they are the same things which are sent to these agents of the shippers (the receivers) and sold by them to the defendants. The transactions affected in this case are in reality between the purchaser and the agents' principal. The agents (the receivers or commission men) represent the principal at the place where the exchange takes place, but the transaction as a commercial entity includes the principal, and includes him as dealing from his place of business in States other than New York. Binderup v. Pathé Exchange, Inc., 263 U. S. 291, 44 Sup. Ct. 96, 68 L. Ed. — (October Term, 1923, U. S. Sup. Ct., opinion Nov. 19, 1923). As was very plainly stated in the recent case of Dahnke-Walker Co. v. Bondurant, 257 U. S. 282, 290, 42 Sup. Ct. 106, 108 (66 L. Ed. 239):

"Where goods in one state are transported into another for purposes of sale the commerce does not end with the transportation, but embraces as well the sale of the goods after they reach their destination and while they are in the original packages" (citing cases).

In the Swift Case, supra, it was stated:

"The injunction, however, refers not to trade among the states in cattle, concerning which there can be no question of original packages, * * *" etc.

In like manner it may be said that the above reference to original packages applies with like force to live poultry. It further appears from the record that many sales by the shippers' agents of the poultry in question take place in Jersey City and Hoboken, N. J., for subsequent transportation to the state of New York; these prices being fixed in like manner by the price committee of the defendant. Such sales, it would appear, are immediately and directly in interstate trade and commerce. I am of the opinion that the court has jurisdiction over the subject-matter, and that the transactions clearly relate to interstate commerce.

[2] We now approach the consideration of the charge that the defendants, thus dealing in interstate commerce, are acting in concert to restrain interstate trade and commerce. It may be truthfully said that the statute has no concern with prices merely, but looks solely to the elimination and restriction of competition. It is immaterial what the intent of the parties may be, if the necessary effect of their concerted action results in direct restriction upon competition, if not its entire elimination. The court will consider, not merely voluntary restraints, where persons agree to suppress competition among them-

selves, but will also inquire as well into involuntary restraints, where persons conspire to compel action by others, or to create artificial conditions which necessarily restrain, impede, or burden the due course of such trade or commerce, or restrict the common liberty to engage therein. Loewe v. Lawlor, 208 U. S. 274, 293, 301, 28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815.

The effect of the fixing of the price by action of the so-called price committee of the defendant organization, by agreement of four persons of such committee, would appear to be purely an arbitrary act, and not the result of the free course of trade. It may well be that the price fixed is reasonable, but the effect is as though the defendants, acting in concert and admittedly controlling the purchase and distribution of a large proportion of the live poultry received from week to week in the New York market from other states, said, in substance, to the receivers, acting as agents for the shippers:

"This is the price at which your poultry will be taken off your hands. We are acting in concert, and our members are bound by our rules to accept our dictum as to purchase price, without independent thought or action."

In fact, the defendants, through the price committee, establish a market quotation at which all live poultry must be sold for use and consumption in New York City, and the publication and acceptance of this agreed price must of necessity directly affect the price paid for poultry over a very large area of the country.

It is charged, and it is a reasonable and proper inference from the pleadings and the affidavits, that the defendants, in addition to fixing the price, threaten to boycott, or do boycott, receivers of such poultry, if they do not sell at the price fixed, to the buyers, and also by such action they institute a secondary boycott upon buyers or wholesalers of whom the association may not approve, or, putting it another way, they compel such buyers and wholesalers to observe resale prices and division of customers in their resales of such poultry on the New York market. The defendants' answer, in substance, admits that the defendant association and its officers and members have entered into a combination for the purpose of fixing in concert a price for all such live poultry sold in this market, as stated; but they say, by way of defense, that the price so agreed and announced by the price committee is not altogether an arbitrary price, but is based upon examination of the supplies available, and also upon conferences with the various receivers. But there is no contention that the receivers are grouped together, on the one hand, to bargain on behalf of their shippers as against the combined power of the defendants; but the combined power of the defendants operates against the individual strength of individual receivers, which, of necessity, results in the balance of power resting with the purchasing group, who are combined together in concert and fix the price, as indicated. In paragraph 11 of the answer appears the statement:

"That defendants claim the right to discipline the members of the defendant organization by refusing to buy from commission men who sell to members who fail to abide by the rules of the association."

In other words, it would seem that the defendants assert the right and the power to prevent any receiver or receivers from disposing of this poultry of interstate commerce to any purchaser who may be banned. This results in a secondary boycott against members of the association who depart from such rules. The court is of the opinion that a very clear case is made out by the United States for an injunction substantially as prayed for in the petition and the moving papers.

The injunction will be granted, and the order as to details may be settled on notice.